# Exhibit A

# ASSET PURCHASE AGREEMENT

## DATED AS OF September 1, 2021, BY AND AMONG

## Penn Treaty Homes LLC and 1121 Pier Village LLC

## AS SELLERS,

## AND

## DIO Industrials LLC and/or affiliated entities

## AS PURCHASER

# TABLE OF CONTENTS

SECTION 1 INTERPRETATION.................................................................................................1

   1.1. Definitions ......................................................................................................................1

SECTION 2 PURCHASE, SALE, AND ASSIGNMENT OF PURCHASED ASSETS ...............6

   2.1. Sale of Assets..................................................................................................................6

   2.2. Excluded Assets ..............................................................................................................7

   2.3. Assumed Liabilities ........................................................................................................7

   2.4. Excluded Liabilities ........................................................................................................8

   2.5. Purchase Price..................................................................................................................9

   2.6. Purchaser Deposit ...........................................................................................................9

   2.7. Allocation of Purchase Price ..........................................................................................9

   2.8. Sale at Closing Date.......................................................................................................10

   2.9. Excluded Assets and Liabilities....................................................................................10

SECTION 3 REPRESENTATIONS AND WARRANTIES OF SELLER ..................................10

   3.1. Organization and Good Standing...................................................................................10

   3.2. Authorization .................................................................................................................10

   3.3. No Conflicts ...................................................................................................................10

   3.4. Consents and Approvals ................................................................................................10

   3.5. Compliance with Law....................................................................................................11

   3.6. Title to Assets ................................................................................................................11

   3.7. Environmental Matters. .................................................................................................11

   3.8. Litigation........................................................................................................................11

   3.9. Real Property ..................................................................................................................11

3.10. No Broker or Finder ........................................................................................11

3.11. Insurance ........................................................................................................11

3.12. Taxes ..............................................................................................................12

3.13. All Material Information ..................................................................................12

3.14. Disclaimer of Other Representations and Warranties .....................................12

3.15. Collective Bargaining Agreements, Employment Agreements, Etc. .............12

SECTION 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER .........................12

4.1. Organization and Good Standing .......................................................................12

4.2. Authorization ....................................................................................................12

4.3. No Conflicts .......................................................................................................13

4.4. Consents and Approvals ...................................................................................13

4.5. Litigation ...........................................................................................................13

4.6. No Broker or Finder ..........................................................................................13

4.7. Capital Resources .............................................................................................13

4.8. Purchaser not a Plan .........................................................................................13

4.9. "AS IS" TRANSACTION ..................................................................................13

SECTION 5 CERTAIN COVENANTS OF SELLER ....................................................14

5.1. Provision of Records .........................................................................................14

5.2. Receipt of Property Relating to Assets .............................................................14

5.3. Access to Information ........................................................................................14

5.4. Bid Procedures Order ........................................................................................14

5.5. Transfer of Permits ...........................................................................................15

5.6. Further Assurances ............................................................................................15

5.7. Assignment of Rights ........................................................................................15

5.8. Break-Up Fee ....................................................................................................15

iii

5.9. Cure Amounts ...................................................................................................15

SECTION 6 CERTAIN COVENANTS OF PURCHASER. ......................................................16

6.1. Performance with Respect to the Assets and the Assumed Contracts ...........................16

6.2. Cure Amounts ...................................................................................................16

6.3. Financing ........................................................................................................16

6.4. Further Assurances ............................................................................................16

SECTION 7 CERTAIN MUTUAL COVENANTS ...................................................................16

7.1. Mutual Cooperation. ...........................................................................................16

7.2. Approvals and Filings .........................................................................................17

SECTION 8 CONDITIONS TO SELLER'S OBLIGATIONS ...................................................18

8.1. Representations and Warranties ...........................................................................18

8.2. Compliance with Agreements ...............................................................................18

8.3. Approvals; No Injunctions ...................................................................................18

8.4. Purchaser's Closing Deliveries and Obligations .......................................................18

8.5. Auction ...........................................................................................................19

8.6. DIP Loan .........................................................................................................18

SECTION 9 CONDITIONS TO PURCHASER'S OBLIGATIONS ...........................................18

9.1. Representations and Warranties ...........................................................................18

9.2. Compliance with Agreements ...............................................................................18

9.3. Approvals ........................................................................................................18

9.4. Seller's Closing Deliveries and Obligations .............................................................18

9.5. Auction ...........................................................................................................19

9.6. Title Insurance Policies and Surveys .....................................................................19

9.7. Environmental Due Diligence ...............................................................................19

SECTION 10 CLOSING ; TERMINATION    ...................................................................20

OMC\4823-7474-5335.v1-8/30/21

10.1. The Closing................................................................................................20

10.2. Termination................................................................................................21

10.3. Effects of Termination ................................................................................23

SECTION 11 TAXES................................................................................................23

11.1. Taxes Related to Purchase of Assets .........................................................23

11.2. Cooperation................................................................................................23

SECTION 12 EXPENSES, EMPLOYEES, ATTORNEYS' FEES, AND BROKERS' FEES ...24

12.1. Expenses ....................................................................................................24

12.2. Attorneys' Fees; Brokers' Fees; Expenses .................................................24

SECTION 13 MISCELLANEOUS ................................................................................24

13.1. Sale of Assets Subject to Bankruptcy Court Approval.................................24

13.2. Survival of Representations and Warranties................................................24

13.3. Entirety of Agreement; Amendments and Waivers.......................................24

13.4. Assignment .................................................................................................25

13.5. Successors and Assigns; No Third Party Beneficiaries ................................25

13.6. Governing Law; Jurisdiction .......................................................................25

13.7. Gender and Number....................................................................................25

13.8. Headings.....................................................................................................25

13.9. Construction................................................................................................25

13.10. Severability ...............................................................................................26

13.11. Negotiated Agreement ..............................................................................26

13.12. Notices .....................................................................................................26

13.13. Counterparts; Facsimile Copies................................................................27

OMC\4823-7474-5335.v1-8/30/21

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made on the date executed below, by and among DIO Industrials LLC and/or affiliated entities, a Florida limited liability company ("Purchaser"), and Penn Treaty Homes LLC and 1121 Pier Village LLC ("Sellers" or "Debtors" or "Debtors-in-Possession").

## W I T N E S S E T H :

WHEREAS, on May 23, 2021, Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court (as defined below), which were subsequently jointly administered under In re 1121 Pier Village LLC, Case No. 21-11466-elf (Bankr. E.D. Pa.); and

WHEREAS, Sellers are continuing in the possession of their assets and in the management of their business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, Sellers are each the owner of one parcel of real property which is being developed for residential rental (the "Real Property") and related furniture, fixtures, machinery, and equipment as well as potential causes of action and other valuable assets; and

WHEREAS, Purchaser desires to purchase from Sellers, and Sellers desire to sell, transfer and assign to Purchaser, the Assets (defined below) in accordance with this Agreement and in accordance with Section 363 of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, promises, and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1
## INTERPRETATION

1.1.    Definitions. Whenever used in this Agreement, the following words and phrases shall have the respective meanings ascribed to them as follows.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Asset Purchase Agreement and has the meaning set forth in the preamble as may be subsequently amended or modified.

"Ancillary Agreements" means, together, the Assignment and Assumption Agreement, the Bill of Sale, the Deed, and the Deposit Escrow Agreement.

"Assets" means, other than the Excluded Assets, the Real Property and all of Seller's tangible and intangible assets, processes, designs, rights, claims and contracts owned, leased, and/or licensed by any Seller of every kind, character, and description, whether accrued, contingent or otherwise, including, causes of action and Avoidance Actions, existing as of the Closing (which Assets comprise substantially all of Seller' assets, properties, rights, claims, and contracts), including, without limitation those Assets set forth in Section 2.1.

"Assignment and Assumption Agreement" means that certain assignment and assumption agreement to be executed at Closing with respect to the Assumed Contracts, in a form to be agreed upon by Purchaser and Seller.

"Assumed Contracts" has the meaning set forth in Section 2.3.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the auction in connection with the sale of the Assets, as described in the Bid Procedures Order.

"Avoidance Actions" means all causes of action arising under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" means the United States Bankruptcy Court for Eastern District of Pennsylvania.

"Bid Procedures Motion" means the motion to be filed by Sellers in the Case seeking the entry of the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court, the form and substance of which shall be subject to the approval of Purchaser and Sellers in their sole discretion.

"Bidders" has the meaning set forth in Section 10.1(d).

"Bids" has the meaning set forth in Section 10.1(d).

"Bill of Sale" means that certain bill of sale to be executed at Closing with respect to the Assets other than the Assumed Contracts, in a form to be agreed upon by Purchaser and Sellers.

"Break-Up Fee" has the meaning set forth in Section 5.8.

"Business" means each Sellers' business as a residential real estate developer.

"Business Day" means a day other than a Saturday, Sunday or any other day on which the principal national banks in the State of New Jersey are not open for business during normal banking hours.

2

"Case" means the Chapter 11 cases of Sellers filed in the Bankruptcy Court.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contracts" means all commitments, contracts, leases, licenses, agreements, and understandings, written or oral, relating to the Assets or the operation of the Business to which any Seller is a party or by which any Seller or any of Assets are bound.

"Cure Amounts" means all amounts payable in connection with the cure of defaults of any of the Assumed Contracts.

"Deed" has the meaning set forth in Section 10.1(a)(iii).

"DIP Loan" means the debtor-in-possession financing facility provided by Purchaser or an affiliated entity to the Debtor in the amount up to $800,000.00.

"Encumbrances" means, with respect to any Asset, any mortgage, deed of trust, deed to service debt, pledge, security interest, lien, charge, lease, claim, encumbrance, option, right of first refusal, imperfection of title, covenant, encroachment, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, state of facts or any other restrictions or third party rights.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Expense Reimbursement" has the meaning set forth in Section 5.4.

"GAAP" means accounting principles generally accepted in the United States of America, consistently applied.

"Governmental Authority" means any United States federal, state or local government or any foreign government, or political subdivision thereof, or any multinational organization or authority or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"Law" means any federal, state, local or foreign statute, law, code, ordinance, order, rule or regulation, or any common law requirement.

"Liability" means any debt, liability, duty, responsibility, obligation, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, or obligation of any kind, whether known or unknown, asserted, or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained,

3

incurred or asserted or when the relevant events occurred, or circumstances existed, including all costs and expenses relating thereto.

"Orders" means all orders of the Bankruptcy Court which are necessary to authorize or consummate the Transactions.

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited liability company, operating or partnership agreement, and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all bylaws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Permitted Encumbrances" means those Encumbrances which Purchaser elects in writing and any other Encumbrances such as utility easements, zoning restrictions, tax liens (for taxes not yet due and payable), judgments, other exemptions noted on a current survey, or other customary covenants and restrictions of record that do not adversely affect the ownership or leasing of the Real Property and Encumbrances related to Assumed Liabilities.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority, or other entity of any kind.

"Pre-Closing Returns" has the meaning set forth in Section 3.12.

"Providing Party" has the meaning set forth in Section 7.1(b).

"Purchase Price" means the purchase price payable to Sellers for the Assets provided for in Section 2.5.

"Purchaser" has the meaning set forth in the preamble.

"Qualifying Bid" has the meaning set forth in Section 10.1(e).

"Real Property" means all real property owned by the Sellers and all easements granted to Sellers, located at 1121-31 N. Delaware Avenue, Philadelphia, PA 19125 and 1143-51 N. Delaware Avenue, Philadelphia, PA 19125, together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto.

"Secured Creditor" means any creditor with a valid and allowed secured claim against the Assets of the Debtor.

"Sellers" has the meaning set forth in the preamble.

"Superior Bid" has the meaning set forth in Section 10.1(d).

OMC\4823-7474-5335.v1-8/30/21

"Tax" or "Taxes" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies, or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, alternative or add-on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including any interest, penalties or additions thereto, whether disputed or not, and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability, operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Authority" means any domestic (whether federal, state, or local) or foreign governmental authority having responsibility for taxation.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing required to be supplied to a taxing authority in connection with Taxes.

"Termination Date" has the meaning set forth in Section 10.2(b).

"Transactions" mean the transactions contemplated by this Agreement, the Ancillary Agreements, and all other transactions and agreements contemplated hereby and thereby.

"Transaction Taxes" has the meaning set forth in Section 11.1.

## SECTION 2
## PURCHASE, SALE, AND ASSIGNMENT OF PURCHASED ASSETS

2.1.    Sale of Assets. Subject to the terms and conditions of this Agreement, at Closing, Sellers shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in the Assets, free and clear of all Encumbrances other than the Permitted Encumbrances, including all of Sellers' right, title, and interest in the following:

(a)    all Real Property, together with all buildings, structures, improvements, and other appurtenances thereto and thereon;

(b)    all interests of Sellers in the Assumed Contracts;

(c)    any and all claims and causes of action of Sellers or its Chapter 11 estate against third parties, including, without limitation, all Avoidance Actions. For the avoidance of doubt, this sale shall not convey any causes of action of the Sellers that are asserted in 1121 Pier Village LLC et al. v. Sharestates Intercap Line LLC et al., Adversary No. 21-44-elf, which causes of action are an Excluded Asset;

(d)    all Permits that relate to the Real Property;

(e)    all rights of any Seller relating to customer deposits and prepaid charges and expenses, and claims for refunds relating to the Assets;

5

(f)      all books and records, files, data, reports, computer codes, and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, accounting and tax files, personnel records, and other records of any Seller or related to the operations of any Seller and/or the Business;

2.2.   <u>Excluded Assets</u>.  Notwithstanding the generality of <u>Section 2.1</u>, the following assets are not a part of the sale and purchase contemplated by this Agreement and are excluded from the Assets (collectively, the "<u>Excluded Assets</u>"):

(a)      all cash and cash equivalents of Sellers (other than the Restricted Cash);

(b)      third-party assets;

(c)      privileged documents;

(d)      federal income tax refunds;

(e)      any Contracts other than the Assumed Contracts;

(f)      the Purchase Price;

(g)      all rights, claims, and causes of action of Sellers relating to this Agreement;

(h)      all corporate minute books, stock transfer books, the corporate seal of a Seller and all other corporate books and records relating to Seller's organization and existence; and

(i)      any equity interests in a Seller.

(j)      Any causes of action of the Sellers that are asserted in <u>1121 Pier Village LLC et al. v. Sharestates Intercap Line LLC et al.</u>, Adversary No. 21-44-elf.

2.3.   <u>Assumed Liabilities</u>.  No less than ten (10) days prior to the Sale Hearing, Purchaser shall designate which of such Contracts it wishes to have Sellers assign to Purchaser (the "<u>Assumed Contracts</u>"), which (subject to <u>Sections 6.3</u> and <u>10.10</u> below) Appropriate deletions shall be made to this designation at the Closing and a schedule of Assumed Contracts and any Cure Amounts relating thereto, shall be filed by Sellers with the Bankruptcy Court prior to the Sale Hearing. At Closing, Purchaser shall be required to provide adequate assurance of future performance with respect to any Assumed Contracts. Effective as of the Closing Date, Purchaser shall assume and thereafter in due course pay, fully satisfy, discharge and perform the Liabilities of Sellers arising after the Closing under the Assumed Contracts and the other Liabilities of Seller referred to in this <u>Section 2.3</u> (collectively, the "<u>Assumed Liabilities</u>"), as follows:

(a)      all accrued liabilities (including, without limitation, any accrued salaries, vacation pay, or other compensation expense) and all deferred revenues as of the Closing Date that arose in the ordinary course of Sellers' business;

     (b)      all Liabilities relating to ownership or use of the Real Property or Assets or otherwise relating to the Business, in each case, arising prior the Closing; and

     (c)      all Liabilities to pay for, purchase, or acquire assets, supplies, or services ordered, but not received and/or consumed by Sellers on or prior to the Closing Date (whether pursuant to purchase orders or otherwise) in the ordinary course of Sellers' business

Notwithstanding the foregoing, on or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order, Purchaser shall have the right to reject and not assume some or all of the following Liabilities: (i) Liabilities for any salary, accrued vacation or other employee compensation, benefit or payment obligation under clause (a) above, and/or (ii) Liabilities relating to Seller' ownership of the Real Estate under clause (b) above. Each Seller shall promptly provide all information and materials reasonably requested by Purchaser relating to these Liabilities and shall otherwise cooperate and assist Purchaser, at Purchaser's request, in evaluating these Liabilities, including, without limitation, providing Purchaser with a detailed accounting of the cash value of such Liabilities. Purchaser shall deliver Seller written notice on or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order of any Liability with respect to which it elects to exercise its rights under the preceding sentence to reject and not assume (in which case, any such Liability shall be an Excluded Liability).  To the extent not Assumed, and paid for the Purchase price will be increased to reflect the non-payment.

     2.4.   <u>Excluded Liabilities</u>.  Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including, but not limited to, the following liabilities, which shall be and remain Liabilities of Seller:

     (a)      Liabilities which are not Assumed Liabilities;

     (b)      Liabilities associated with any Excluded Assets;

     (c)      Liabilities associated with any and all indebtedness of any Seller for borrowed money not included in the Assumed Liabilities;

     (d)      Liabilities arising out of or in connection with claims, litigation, and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date (other than as set forth in <u>Section 2.3</u> hereof);

     (e)      penalties, fines, assessments, settlements, interest, costs, and expenses arising out of or incurred as a result of any actual or alleged violation by any Seller of any Law prior to the Closing Date;

     (f)      All Liabilities for expenses (i) relating to the negotiation and preparation of this Agreement and (ii) relating to the Transactions, in each case to the extent incurred by

Seller and including those related to legal counsel, accounting, brokerage, and investment advisors fees and disbursements;

(g)     Any Liabilities related to the Permitted Encumbrances.

2.5.    <u>Purchase Price</u>.   The aggregate purchase price for the Assets shall equal $12,000,000.00 less the Assumed Liabilities (the "<u>Base Purchase Price</u>"), a portion of which may be in the form of a credit bid.  To the extent the Base Purchase Price is not in the form of a credit bid, it shall be payable in immediately available funds to Sellers in accordance with the wire instructions to be delivered by Sellers to Purchaser prior to the Closing.

2.6.    <u>Reserved.</u>

2.7     <u>Allocation of Purchase Price</u>.  Within one year of the Closing Date, Purchaser and Sellers shall prepare and file those statements or forms (including Form 8594) required by Section 1060 of the Code and the Treasury regulations thereunder and shall file such statements or forms with their respective applicable federal income Tax Returns due after the Closing Date. The parties shall prepare such statements or forms consistent with the allocation of all or a portion of the Purchase Price plus the Assumed Liabilities among the Assets as proposed by Purchaser. Each party shall provide the other party with a copy of such statements or forms as filed.

2.8     <u>Sale at Closing Date</u>.  The sale, transfer, assignment, conveyance, and delivery by Sellers of the Assets to Purchaser and the assumption by Purchaser of the Assumed Liabilities, as provided herein and in the Ancillary Agreements, shall be effected on the Closing Date by (i) the execution and delivery by Sellers and Purchaser of the Assignment and Assumption Agreement with respect to the Assumed Contracts and the Assumed Liabilities, (ii) the execution and delivery by Sellers to Purchaser of Deeds with respect to the Real Property,

2.9     <u>Excluded Assets and Liabilities</u>.   Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

**SECTION 3**
**<u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>**

Sellers hereby jointly and severally represent and warrant to Purchaser as follows:

3.1.    <u>Organization and Good Standing</u>.  Each Seller is a Pennsylvania limited liability company. Sellers are (a) validly existing and in good standing under the laws of the jurisdiction of its organization and (b) duly qualified to do business and in good standing in each jurisdiction in which the ownership, use, or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary.

3.2.    <u>Authorization</u>.  Subject to entry of the Sale Order, Sellers have all requisite power and authority to execute and deliver, and carry out its obligations under, this Agreement and the Ancillary

8

Agreements and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory or otherwise, against doing so. This Agreement and the Ancillary Agreements have been or will be duly executed and delivered by Sellers and, assuming due authorization, execution, and delivery by Purchaser, constitutes or will constitute the legal, valid, and binding obligation of Sellers, enforceable against it in accordance with its terms, subject to entry of the Sale Order.

3.3.    No Conflicts.  The execution, delivery, and performance by Sellers of this Agreement and each of the Ancillary Agreements and the consummation by Sellers of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of such Seller, (ii) violate any Law to which such Seller is subject, (iii) conflict with, result in any violation of any term or condition of, result in a breach or termination of, or constitute a default under any Contract to which such Seller is a party or result in the creation of any Encumbrance upon any of the Assets (including any Assumed Contract), other than the mortgage obligations of each Seller to Sharestates Intercap Line LLC or entities affiliated therewith and the mortgage obligation of 1121 Pier Village LLC to the Henry J. Stewart Trust, or (iv) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which such Sellers are a party or by which such Seller is bound, other than the mortgage obligations of each Seller to Sharestates Intercap Line LLC or entities affiliated therewith and the mortgage obligation of 1121 Pier Village LLC to the Henry J. Stewart Trust.

3.4.    Consents and Approvals.  The execution, delivery, and performance by Sellers of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not require the consent or approval of, or filing with, any Governmental Authority.

3.5.    Permits.

(a)    Sellers are in compliance with Sellers' Organizational Documents.

(b)    Sellers shall provide Purchaser with a true and complete list of all material approvals, permits, certificates, qualifications, authorizations, licenses, franchises, consents, orders, and registrations, together with all modifications, amendments, supplements, and extensions thereof, of all United States federal, state and local Governmental Authorities and any other Person that are necessary for Sellers to own the Assets, if any (collectively, the "Permits").

3.6.    Title to Assets.    Sellers are the owner of the Assets as of the date hereof. Subject to entry of the Sale Order, Sellers have, and at the Closing, Purchaser shall receive, good, valid and marketable title to the Assets, free and clear of any and all Encumbrances except for the Permitted Encumbrances. At Closing, this Agreement and the Ancillary Agreements will effectively vest in Purchaser all of Sellers' right, title, and interest in the Assets and Purchaser. No Asset is subject to any agreement, written or oral, for its sale or use by any Person other than Sellers.

3.7.    Deposit.    Upon approval of the Bid Procedures Order, Purchaser shall deposit $400,000.00 in escrow (the "Deposit") pursuant to the terms of an escrow agreement that will be entered into among the parties and an escrow agent on or before the execution of the Asset Purchase Agreement. The Deposit shall become non-refundable and released to Seller in the event that the Asset Purchase Agreement is terminated on account of a material breach by Buyer, in

9

which case the Deposit shall be deemed to be liquidated damages and Seller's sole and exclusive remedy.

3.8.    <u>Litigation</u>.   No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Sellers' knowledge, has been threatened against any Seller, or any director or officer of any Seller in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions, or which relates to, or could have a Material Adverse Effect on, the Assets.

3.9.    <u>Real Property</u>.  Sellers own and have valid title to all of the Real Property used in the operation of the Business, free and clear of any and all Encumbrances (except for Permitted Encumbrances).

3.10.    <u>No Broker or Finder</u>.  No broker or finder has been engaged by any Seller in connection with the Transactions.

3.11.    <u>Insurance</u>.    All insurance policies maintained by Sellers are with reputable insurance carriers, and provide coverage appropriate in character and amount for the Assets. Each such insurance policy is in full force and effect, and all premiums due and payable in respect thereof have been paid.

3.12.    <u>Taxes</u>.   Sellers have filed all Tax Returns required to be filed by it on or before the Closing Date with any Taxing Authority (collectively, the "<u>Pre-Closing Returns</u>"). Sellers have timely paid, withheld, or reserved all Taxes shown as due and payable in the Pre-Closing Returns except for such Taxes that are being contested in good faith by appropriate proceedings.

3.13.    <u>All Material Information</u>. No representation or warranty made herein by Sellers and no statement contained in any schedule or certificate furnished or to be furnished to Purchaser by Sellers in connection with the transactions contemplated by this Agreement contains or shall contain a knowingly untrue statement of a material fact or omits to state any material fact necessary in order to make any representation, warranty, or other statements of Sellers not misleading.

3.14.    <u>Disclaimer of Other Representations and Warranties</u>. Except as expressly set forth in this <u>Section 3</u>, Sellers make no representation or warranty, statutory, express or implied, at law or in equity, in respect of Sellers or any of its assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied that extend beyond the warranties contained in this Agreement. Purchaser hereby acknowledges and agrees that, except to the extent specifically set forth in this <u>Section 3</u>, Purchaser is purchasing the Assets on an "as-is, where-is" basis and "with all faults."

## SECTION 4
## <u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>

Purchaser hereby represents and warrants to Sellers as follows:

4.1.    <u>Organization and Good Standing</u>.  Purchaser is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Florida and has full corporate power and authority to enter into and carry out its obligations under this Agreement.

4.2.    <u>Authorization</u>.  Purchaser has all requisite power and authority to execute and deliver and carry out its obligations under this Agreement and the Ancillary Agreements, and consummate the Transactions, and is not under any prohibition or restriction, contractual, statutory, or otherwise, against doing so. Each of this Agreement and the Ancillary Agreements has been or will be duly executed and delivered by Purchaser and, assuming due authorization, execution, and delivery by Sellers, constitutes or will constitute the legal, valid, and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws affecting the rights of creditors generally and by general principles of equity (regardless of whether enforcement is considered in a proceeding at law or in equity).

4.3.    <u>No Conflicts</u>.  Consummation by Purchaser of the Transactions shall not, with or without the giving of notice or lapse of time, (i) violate any provision of the Organizational Documents of Purchaser, (ii) violate any Law to which Purchaser is subject, or (iii) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Purchaser is a party or by which Purchaser is bound.

4.4.    <u>Consents and Approvals</u>.  The execution, delivery, and performance by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transaction do not require the consent or approval of, or filing with, any Governmental Authority.

4.5.    <u>Litigation</u>.  No lawsuit, governmental investigation or legal, administrative or arbitration action or proceeding is pending or, to the best of Purchaser's knowledge, has been threatened against Purchaser, or any director or officer of Purchaser in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transactions or would otherwise have a material adverse effect on Purchaser's ability to finance or otherwise consummate the Transactions.

4.6.    <u>No Broker or Finder</u>.  No broker, finder, or financial advisor has been engaged by Purchaser in connection with the Transactions.

4.7    <u>Capital Resources</u>.  Purchaser has the financial wherewithal to close the Transactions as contemplated under this Agreement.  To the extent financing is required, but not a condition of the obligations to close under this Agreement, true, accurate, and complete copies of commitment letter(s) for the financing necessary to close the Transactions have been delivered to Sellers prior to the date hereof.  As of the date hereof, each of the foregoing commitment letters, in the form so delivered, is a legal, valid, and binding obligation of the parties thereto.  As of the date hereof, the foregoing commitment letters is in full force and effect and has not been withdrawn or terminated (and no party thereto has indicated an intent to so withdraw or terminate) or otherwise amended or modified in any respect, and Purchaser is not in breach of any of the terms or conditions set forth therein.

OMC\4823-7474-5335.v1-8/30/21

4.8.    <u>Purchaser not a Plan</u>.    Purchaser is not an "employee benefit plan" as defined in ERISA, whether or not subject to ERISA, or a "plan" as defined in Section 4975 of the Code and none of Purchaser's assets constitutes (or is deemed to constitute for purposes of ERISA or Section 4975 of the Code, or any substantially similar federal, state or municipal law) "plan assets" for purposes of 29 CFR Section 2510.3-101, as amended by Section 3(42) of ERISA or otherwise for purposes of ERISA or Section 4975 of the Code.

4.9.    **"AS IS" TRANSACTION.** PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSETS AS PERMITTED IN THE SHORTENED TIME-FRAME OF THIS ASSET PURCHASE PROCESS AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

### SECTION 5
### CERTAIN COVENANTS OF SELLER

5.1.    <u>Provision of Records</u>. Sellers shall arrange at Purchaser's cost as soon as practicable following the Closing Date for transportation to Purchaser of the documents in the possession of any Seller relating to the Assets, to the extent not previously delivered in connection with the Transactions, including all agreements and filings with Governmental Authorities, but excluding documents relating to the Excluded Assets or the Excluded Liabilities.

5.2.    <u>Receipt of Property Relating to Assets</u>. If the Sellers, or any other Person acting for or in concert with any Seller, shall receive any money, check, note, draft, instrument, payment, or other property as proceeds of the Assets or the Assumed Liabilities or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, immediately upon receipt thereof, shall notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner specified by Purchaser.

5.3.    <u>Access to Information</u>. Upon reasonable notice by Purchaser, Purchaser and its representatives shall have reasonable access during normal business hours throughout the period from the date hereof through the Closing Date, or the earlier termination of this Agreement in accordance with its terms, to the Assets and documents relating thereto, and during such period Seller shall furnish promptly to Purchaser, at Purchaser's expense, all information concerning the Assets as Purchaser may reasonably request. Sellers shall provide or cause to be provided to Purchaser, at

12

Purchaser's expense, such copies or extracts of documents relating to the Assets as Purchaser may reasonably request. Any inspections, examinations, and audits shall be conducted during normal business hours by Purchaser's employees or agents upon reasonable advance notice.

5.4.    <u>Bid Procedures Order</u>. Sellers shall use its commercially reasonable efforts to obtain entry of the Bid Procedures Order by the Bankruptcy Court that provides, at a minimum, that: (a) all Competing Bidders must agree to be bound by all of the terms and conditions of this Agreement except as modified as to price; (b) all Competing Bidders must provide adequate assurance of their ability to perform their obligations pursuant to any bid without contingency; (c) all Competing Bidders must provide value to the estate equal to the value in this Agreement plus $250,000.00 and the Break-Up Fee and Expense Reimbursement (as defined below); (d) if the Bankruptcy Court does not otherwise approve the Purchase Agreement, or if the Sellers elect to withdraw the motion seeking the approval of the Purchase Agreement, Purchaser shall be entitled to an administrative expense claim in the amount of the Break-Up Fee of $120,000.00 plus Expense Reimbursement for actual costs incurred in connection with the Transaction, up to a maximum of $150,000.00 ("Expense Reimbursement"); and (e) the Purchaser shall be permitted to credit bid the Break-Up Fee and Expense Reimbursement at any auction for the Assets.

5.5.    <u>Transfer of Permits</u>. Except for those Permits that are not transferable by Law, Sellers shall use commercially reasonable efforts to cause the issuance or transfer at Purchaser's expense of all Permits relating to the Assets to Purchaser on or before the Closing Date. Sellers shall give and make all notices and reports each Seller is required to make to the appropriate Governmental Authorities and other Persons, each at Purchaser's expense, with respect to the Permits that may be necessary for the sale of the Assets to Purchaser at the Closing.

5.6.    <u>Further Assurances</u>. Upon the request of Purchaser, Sellers shall, at Purchaser's expense, forthwith execute and deliver such documents as Purchaser or its counsel may reasonably request to effectuate the purposes of this Agreement.

5.7.    <u>Assignment of Rights</u>. If, in connection with the Auction or Sale referred to in the Bid Procedures Order, Sellers enter into confidentiality or similar agreements with any Person ("NDAs"), Sellers shall assign all rights under those NDAs to the extent relating to the Business or Assets to Purchaser at the Closing and to the extent such rights are assignable.

5.8.    <u>Break-Up Fee</u>. If this Agreement is terminated as a result of a breach by Sellers, or Sellers accept an alternative bid, then Sellers shall pay to Purchaser (a) a break-up fee of $120,000.00 (the "Break-Up Fee") and (b) reimbursement of all expenses incurred by Purchaser in connection with the Transaction, up to a maximum of $150,000.00 (the "Expense Reimbursement"). Sellers' obligation to pay the Break-Up Fee and Expense Reimbursement shall constitute administrative expenses of the kind specified in Section 503(b)(1) of the Bankruptcy Code, shall constitute a carve out from any and all encumbrances on the Purchased Assets (which carve out shall transfer to any and all encumbrances on the proceeds thereof at the Closing) and shall not be subject to secured claims of any party, notwithstanding any other order of the Bankruptcy Court. Sellers shall pay the Break-Up Fee and Expense Reimbursement upon the earlier of (x) the closing of an alternative transaction or (y) five (5) business days after termination of this Agreement as a result of a breach by Sellers

5.9.    Cure Amounts. Within ten (10) business days of the date hereof, Sellers shall provide Purchaser with a schedule of the true and correct monetary Cure Amounts with respect to each of the Contracts consistent with its books and records.

# SECTION 6
# CERTAIN COVENANTS OF PURCHASER.

6.1.    Performance with Respect to the Assets and the Assumed Contracts. Purchaser agrees that from and after the Closing Date, that it shall (i) assume all Assumed Liabilities, and (ii) take all actions necessary to satisfy its obligations and liabilities with respect to the Assumed Liabilities (including, without limitation, under the terms and conditions of each Assumed Contract).

6.2.    Reserved.

6.3.    Financing. On or prior to two Business Days prior to the bidding deadline set forth in the Bid Procedures Order, at the written request of Sellers, Purchaser shall deliver to Sellers (i) proof of cash deposits in an amount equal to the obligation at Closing on this Agreement; or (ii) an executed debt commitment letter(s) in form reasonably acceptable to Sellers pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide, on behalf of Purchaser, the funds to Close.

6.4.    Further Assurances. Upon the request of Sellers, Purchaser shall, at Sellers' expense, forthwith execute and deliver such documents as Sellers or their counsel may reasonably request to effectuate the purposes of this Agreement.

# SECTION 7
# CERTAIN MUTUAL COVENANTS

7.1.    Mutual Cooperation.

(a)    Sellers, on the one hand, and Purchaser, on the other hand, shall promptly give notice to the other upon becoming aware that any action is pending or threatened by or before any Governmental Authority with respect to the Transactions. Sellers, on the one hand, and Purchaser, on the other hand, (i) shall cooperate with each other in connection with the prosecution, investigation or defense of any such action, (ii) shall promptly supply all information requested by the other, by any such Governmental Authority or by any party to any such action that is legally required to be produced, and (iii) shall each use commercially reasonable efforts to cause any such action to be determined as promptly as practicable and in a manner which does not impact adversely on, and is consistent with, the Transactions.

(b)    After the Closing Date, Sellers and Purchaser shall use commercially reasonable efforts to provide to any other party to this Agreement (the "Requesting Party") such records and information and to make available to the Requesting Party such employees or other personnel, in each case as may be reasonably requested in writing by the Requesting Party, for the purpose of assisting the Requesting Party in responding to governmental

14

inquiries, making required governmental filings or defending or prosecuting any action or other proceeding involving any Person other than the party providing such information or records or making available such employees or other personnel (the "Providing Party") and in resolving all claims, preparing all tax returns, and handling all matters necessary to administer and close the Cases; provided, however, that no Providing Party shall be required to (i) incur any out-of-pocket expenses, (ii) provide information, records or employees or other personnel under circumstances which the Providing Party believes in its sole reasonable determination may expose it to liability to any Person or may prejudice any commercial, legal or other interest of the Providing Party, or (iii) take any action that in the Providing Party's reasonable determination unreasonably interferes with its business.

(c)      Sellers and Purchaser shall use their reasonable best efforts to cooperate, assist and consult with each other to procure the entry of the Bid Procedures Order as promptly thereafter as practicable. Without limiting the generality of the foregoing, Sellers shall (i) comply with all requirements under the Bankruptcy Code and Federal Bankruptcy Rules in connection with obtaining the Orders, (ii) agree to proceed with the Case pursuant to and in accordance with the terms and provisions contemplated by the Orders, in each case after the order has been entered by the Bankruptcy Court and (iii) comply or cause the compliance with the notice requirements of the Orders, in each case after the order has been entered by the Bankruptcy Court, and any other applicable order of the Bankruptcy Court as they relate to the Case, the Federal Bankruptcy Rules (including, without limitation, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure) and any applicable rules of the Bankruptcy Court with respect to the Transactions contemplated by this Agreement. In the event that the Orders or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument shall be filed with respect to any such order), Sellers and Purchaser will cooperate in taking such steps diligently to defend against such appeal, petition or motion and Sellers and Purchasers shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion. Neither Purchaser nor Sellers shall make any filing in the Bankruptcy Court with respect to the Orders (or otherwise take any position in the Bankruptcy Court proceedings with respect thereto) without the express written consent of the other party, which may not be unreasonably withheld, conditioned or delayed, or otherwise, that would be reasonably likely to result in the failure of the transactions contemplated hereby. Notwithstanding anything to the contrary herein, however, nothing shall be deemed to prohibit or otherwise restrain Seller from accepting a Superior Bid in accordance with the terms of the Bid Procedures Order or Purchaser from making any filing in the Bankruptcy Court to challenge or object to the entry of an order by the Bankruptcy Court approving the entry by Seller into a Superior Bid.

(d)      Subject to the terms and conditions of this Agreement, Sellers and Purchaser shall take all reasonable steps to close the sale of the Assets pursuant to this Agreement on or prior to the Termination Date.

(e)      Purchaser is entitled to the benefits and protections of Section 363(m) of the Bankruptcy Code in connection with this Transaction.

7.2.    <u>Approvals and Filings</u>. (a) Subject to the terms and conditions of this Agreement, including the possible closing of a Superior Bid, each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the Transactions, including using commercially reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, and effecting all necessary registrations and filings. Purchaser shall make or cause to be made all filings and submissions under Laws applicable to Purchaser, if any, as may be required for the consummation of the Transactions. Sellers shall make or cause to be made all such other filings and submissions under Laws applicable to any Seller, if any, as may be required for the consummation of the Transactions. Purchaser, on the one hand, and Sellers, on the other hand, shall coordinate and cooperate in exchanging such information and reasonable assistance as may be requested by either of them in connection with the filings and submissions contemplated by this <u>Section 7.2</u>. Purchaser, on the one hand, and Sellers, on the other hand, shall each promptly provide the other or their respective counsel with copies of all filings made by such party with any Governmental Authority in connection with this Agreement and the Ancillary Agreements and the Transactions.

**SECTION 8**
**<u>CONDITIONS TO SELLERS' OBLIGATIONS</u>**

The obligations of Sellers to consummate the Transactions are subject to the satisfaction (unless waived in writing by Sellers) of each of the following conditions on or prior to the Closing Date:

8.1.    <u>Representations and Warranties</u>. The representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality or a material adverse effect shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Purchaser contained in this Agreement that are qualified by materiality or a material adverse effect shall be true and correct in all respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case they shall be true and correct as of such earlier date.

8.2.    <u>Compliance with Agreements</u>. Purchaser shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

8.3.    <u>Approvals; No Injunctions</u>. Any material Permit or approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy. Such Permits or approvals shall be in full force and effect on the Closing Date. No Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment, decree, injunction, or other order that is in effect on the Closing Date and prohibits the consummation of the Closing.

8.4.    <u>Purchaser's Closing Deliveries and Obligations</u>. Purchaser shall have delivered all items and satisfied all obligations pursuant to <u>Sections 8 and 9</u>.

OMC\4823-7474-5335.v1-8/30/21

8.5.    <u>Auction</u>. Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

8.6    <u>DIP Loan</u>.  Purchaser or an affiliated or associated entity has committed to provide Sellers and their co-debtors with a Debtor in Possession loan in an amount up to $800,000.00 (the "DIP Loan"), the proceeds of which DIP Loan may be used to provide working capital to support operations through the Closing, and pay certain administrative expenses.  The receipt of the DIP Loan or a similar facility from the Purchaser or an affiliated or associated entity, or another lender in a like amount for that purpose, is a condition to the Sellers' obligations under this Agreement.

## SECTION 9
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligation of Purchaser to consummate the Transactions is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

9.1.    <u>Representations and Warranties</u>. The representations and warranties of the Sellers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date.

9.2.    <u>Compliance with Agreements</u>.  Sellers shall have performed and complied in all material respects with all covenants and conditions under this Agreement and the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date.

9.3.    <u>Approvals</u>.  Any material Permit or approval required by a Governmental Authority to close the Transactions shall have been obtained or provided by an order of the Bankruptcy Court.

9.4.    <u>Sellers' Closing Deliveries and Obligations</u>.  Sellers shall have delivered all items and satisfied all obligations pursuant to <u>Sections 5.9</u> and <u>10.1(a)</u>.

9.5.    <u>Auction</u>.  Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order.

9.6.    <u>Title Insurance Policies and Surveys</u>.  Purchaser shall have received from a reputable title insurance company a commitment to issue as of the Closing Date an owners title insurance policy for the real property in amounts, in a form and with such endorsements and surveys of the Real Property and improvements thereon, all as are generally customary for properties similar to the Real Property, and certified to Purchaser, the title insurance company and such other persons as Purchaser may designate.

9.7    <u>Limitation on Credit Bid Rights</u>.  Sellers shall obtain an order limiting or eliminating the ability of Sharestates Intercap Line LLC or any affiliate thereof, and the Henry J. Stewart Trust, pursuant to 11 U.S.C. §363(k), such that Sharestates and Stewart cannot submit a Qualifying Bid as a credit bid.

## SECTION 10
## CLOSING; TERMINATION

OMC\4823-7474-5335.v1-8/30/21

10.1.   The Closing.  The Closing of the purchase by Purchaser from Sellers and Sale by Sellers to Purchaser of the Assets (the "Closing") shall be held on or before November 30, 2021, assuming the satisfaction or waiver of the conditions set forth in Sections 8 and 9 of this Agreement (excluding those conditions which by their nature are to be satisfied as part of the Closing), or at such other time as the parties hereto may agree (the "Closing Date"). The Closing shall be held at the offices of Obermayer Rebmann Maxwell& Hippel LLP, 1500 Market Street, Suite 3400, Philadelphia, Pennsylvania 19102, or at such other location as the parties hereto may agree. At the Closing, all of the transactions provided for in Section 2 hereof shall be deemed to be consummated on a concurrent and simultaneous basis.

(a)   Sellers' Deliveries at Closing. At the Closing, Sellers shall deliver (or cause to be delivered) to Purchaser the following:

(i)   the duly executed Assignment and Assumption Agreement;

(ii)   the duly executed Bill of Sale;

(iii)   the duly executed special warranty deeds in a form to be agreed upon by Purchaser and Sellers (collectively, the "Deeds") conveying to Purchaser good and marketable fee title to the Real Property free and clear of all Encumbrances other than the Permitted Encumbrances;

(iv)   copies of each Assumed Contract;

(v)   certified resolutions of the governing body of Sellers approving and authorizing the Transactions;

(vi)   officer's certificates, executed by a duly authorized officer of Sellers to the effect that all conditions to Closing set forth in Sections 8 and 9 have been satisfied;

(vii)   affidavits executed by Sellers stating that such Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code; and

(viii)   such other documents as Purchaser or its counsel shall reasonably require in order to effect the Transactions.

(b)   Purchaser's Payment of Purchase Price.   At the Closing, Purchaser shall deliver (or cause to be delivered) the Purchase Price to Sellers.

(c)   Purchaser's Deliveries to Sellers at Closing.   At the Closing, Purchaser shall deliver (or cause to be delivered) to Sellers the following:

(i)   the duly executed Assignment and Assumption Agreement;

(ii)   certified resolutions of the governing body of Purchaser approving and authorizing the Transactions;

18

(iii)    a certificate, executed by a duly authorized officer of Purchaser, to the effect that all conditions to Closing set forth in <u>Sections 8 and 9</u> have been satisfied; and

(iv)    such other documents as Sellers or their counsel shall reasonably require in order to effect the Transactions.

(d)    <u>Other Bids</u>.    Purchaser acknowledges that Sellers will solicit higher or better bids ("<u>Bids</u>") from other prospective purchasers (collectively, "<u>Bidders</u>") for the sale of the Assets in accordance with Auction procedures to be set forth in the Bid Procedures Order. Each Bidder will submit two copies of this form of Asset Purchase Agreement marked (in redline) to show changes from this Agreement. Sellers shall have the right to select the Bid or Bids which will create the highest net return to the bankruptcy estate (the "<u>Superior Bid</u>"). Sellers acknowledge that Sellers will strongly favor Bids for all of the Assets or for all of Sellers' assets or for such assets which Sellers determine, in its sole discretion, cannot otherwise be easily sold.

(e)    <u>Overbid Protection</u>. The Bid Procedures Order shall contain the following overbid protections: (i) a higher Bid will not be considered by Sellers unless such Bid is more than the sum of (1) the Purchase Price set forth in this Agreement and the assumption of the Assumed Liabilities, (2) the Break-Up Fee, (3) the Expense Reimbursement; and (4) $250,000.00 and (ii) any bids thereafter must be higher than the then existing highest or better bid (as determined in the reasonable discretion of Sellers) by increments of at least $250,000.00 ((i) and (ii) constituting, as applicable, a "<u>Qualifying Bid</u>").

(f)    <u>Break-Up Fee</u>. If Sellers, (i) determine that a Qualifying Bid (or Bids) (which is not Purchaser's Bid) is the Superior Bid, and (ii) execute a definitive agreement embodying such Superior Bid, then upon consummation of the sale pursuant to the Superior Bid, Sellers will pay to Purchaser the Break-Up Fee and the Expense Reimbursement.

10.2.    <u>Termination</u>.    Anything in this Agreement to the contrary notwithstanding, this Agreement and the Transactions may be terminated in any of the following ways at any time before the Closing and in no other manner, subject to the provisions hereof:

(a)    at any time by mutual written consent of Purchaser and Sellers;

(b)    by Purchaser if the Closing shall not have occurred on or before November 30, 2021, or such later date as Sellers and Purchaser agree or is necessary due solely to the scheduling and availability of the Bankruptcy Court (the "<u>Termination Date</u>"); <u>provided, however</u>, that Purchaser or Sellers may not terminate this Agreement pursuant to this <u>Section 10.2(b)</u> if the Closing shall not have occurred on or before the Termination Date due to a breach by Purchaser or Sellers, as the case may be, of any representations, warranties, covenants or agreements of Purchaser or Sellers, as the case may be, contained in this Agreement;

OMC\4823-7474-5335.v1-8/30/21

(c)      by Sellers, if any condition to the obligations of Seller set forth in <u>Section 8</u>, shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement;

(d)      by Purchaser, if any condition to the obligations of Purchaser set forth in <u>Section 9</u> shall have become incapable of fulfillment (including failure of Purchaser to be the successful bidder at the Auction) other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(e)      by Sellers, if Purchaser is in breach in any respect of any of its representations made in this Agreement or in material breach in any respect of any of its representations not so qualified, or is in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Sellers specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(f)      by Sellers, if in compliance with the terms of the Bid Procedures Order;

(g)      by Purchaser, if the Bid Procedures Order is not issued by September 30, 2021;

(h)      by Purchaser, if the Sellers are in breach in any respect of any of representations made in this Agreement that are qualified by materiality or Material Adverse Effect or in material breach in any respect of any of its representations not so qualified, or are in violation or default in any material respect of any of its covenants or agreements in this Agreement, if such breach, violation or default has not been cured or waived within ten (10) days following receipt of written notice from Purchaser specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction;

(i)      by Sellers or Purchaser if there shall be in effect a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it is agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(j)      by Purchaser, if, as a result of an order of the Bankruptcy Court, the Case is dismissed or converted to Chapter 7;

(k)      by Purchaser if the Bankruptcy Court has not entered an order approving the Transactions by November 8, 2021;

(k)      automatically, if any Seller closes or consummates the sale of the Assets pursuant to a Superior Bid.

10.3    <u>Effects of Termination</u>.

(a)    If this Agreement is terminated pursuant to <u>Section 10.2</u>, this Agreement (other than <u>Section 10.3</u> (Effects of Termination), <u>Section 13</u> (Expenses, Employees, Attorneys' Fees, and Brokers' Fees), each of which shall remain in full force and effect) shall forthwith become null and void, and no party hereto shall have any liability or further obligation to any other party hereto, except as provided in this <u>Section 10.3</u>.

(b)    Sellers' liability under or arising from this Agreement is limited to Sellers' payment of the Break-Up Fee and the Expense Reimbursement if payable pursuant to the terms hereof.

**SECTION 11**
**TAXES**

11.1.    <u>Taxes Related to Purchase of Assets</u>.    The parties recognize and acknowledge that the transaction herein is a sale to be made under and pursuant to Section 363 of the Bankruptcy Code, and is therefore NOT exempt from taxes under section 1146(c) of the Bankruptcy Code.  Purchaser and Sellers shall cooperate in preparing such forms and shall execute and deliver such affidavits and forms as are reasonably requested by the other party.  Purchaser shall pay all transfer taxes.

11.2.    <u>Cooperation</u>.    Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Taxes and for the answer of any governmental or regulatory inquiry relating to Taxes. Purchaser agrees to retain possession of all Tax files, books, and records delivered to Purchaser by Seller for a period of at least five years from the Closing Date. If Purchaser determines to destroy or discard any of such files, books, or records after the end of such five-year period, Purchaser shall give Sellers reasonable notice thereof and shall allow Sellers to take possession of such files, books, and records at Sellers' expense. From and after the Closing Date, Purchaser agrees that it shall provide reasonable access to Sellers and their attorneys, accountants, and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books, and records as Sellers may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Assets.

**SECTION 12**
**EXPENSES, ATTORNEYS' FEES, AND BROKERS' FEES**

12.1.    <u>Expenses</u>.    Except as otherwise provided under this Agreement, Sellers shall be responsible for all expenses, liabilities, and obligations arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership, or operation thereof accruing on or prior to the Closing, as applicable. Purchaser shall be responsible for all expenses, liabilities, and obligations arising out of or relating to the Assets and the Assumed Liabilities or the use, possession, ownership, or operation thereof accruing after the Closing.

12.2.    <u>Attorneys' Fees; Brokers' Fees; Expenses</u>. Each party shall be responsible for the payment of its own attorneys', brokers', and other fees and expenses in connection with the Transactions.

21

## SECTION 13
## MISCELLANEOUS

13.1.   <u>Sale of Assets Subject to Bankruptcy Court Approval</u>.   This Agreement, the sale of the Assets, and Sellers' ability to perform under this Agreement are conditioned and contingent upon Bankruptcy Court approval of the Sale.

13.2.   <u>Survival of Representations and Warranties</u>.   Until the Closing, all representations and warranties herein shall be operative and in full force and effect, and the parties hereto shall be entitled to rely thereon, regardless of any investigation made by or for them. All representations, warranties, and covenants contained herein shall terminate and shall not survive the Closing.

13.3   <u>Entirety of Agreement; Amendments and Waivers</u>.   This Agreement (including all schedules and exhibits hereto), together with the Ancillary Agreements and certificates delivered hereunder, state the entire agreement of the parties with respect to the subject matter hereof, merge all prior negotiations, agreements, and understandings, if any, and state in full all representations, warranties, covenants and agreements which have induced this Agreement. Sellers and Purchaser otherwise make no other representations or warranties, including any implied representations or warranties. Each party agrees that in dealing with third parties, no contrary representations shall be made. This Agreement can be amended, supplemented, or changed, and any provision hereof can be waived only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification, or waiver is sought. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

13.4.   <u>Assignment</u>.   Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by any of the parties without the prior written consent of the other party except, in the case of Purchaser, to an Affiliate (but only if such Affiliate becomes a party to this Agreement and agrees to be bound by the representations, warranties, covenants and obligations herein and Purchaser guarantees such Affiliate's obligations herein and; <u>provided</u>, <u>however</u>, that no such assignment shall relieve Purchaser of its obligations hereunder). No party shall be relieved of any liability hereunder in respect of any assignment pursuant to this <u>Section 13.4</u> unless such assignor has received a written release expressly excepting such assignor from any liability that may arise hereunder.

13.5.   <u>Successors and Assigns; No Third Party Beneficiaries</u>.   This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective heirs, personal representatives, legatees, successors, and permitted assigns.

13.6.   <u>Governing Law; Jurisdiction</u>.   This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania applicable to contracts made and to be entirely performed therein. In the event of any controversy or claim arising

out of or relating to this Agreement or the breach or alleged breach hereof, each of the parties hereto irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court for the Eastern District of Pennsylvania, (ii) waives any objection which it may have at any time to the laying of the venue of any action or proceeding brought in the Bankruptcy Court, (iii) waives any claim that such action or proceeding has been brought in an inconvenient forum, and (iv) agrees that service of process or of any other papers upon such party by registered mail at the address to which notices are required to be sent to such party under Section 13.12 shall be deemed good, proper and effective service upon such party.

13.7.    Gender and Number.    In this Agreement, words importing the singular include the plural and vice versa, and words importing a specific gender include all genders.

13.8.    Headings.    The division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

13.9.    Construction.    In this Agreement (i) words denoting the singular include the plural and vice versa, (ii) "it" or "its" or words denoting any gender include all genders, (iii) the word "including" shall mean "including without limitation," whether or not expressed, (iv) any reference to a statute shall mean the statute and any regulations thereunder in force as of the date of this Agreement or the Closing Date, as applicable, unless otherwise expressly provided, (v) any reference herein to a Section, Exhibit or Schedule refers to a Section of, or Exhibit or Schedule to, this Agreement, unless otherwise stated, (vi) any reference to "knowledge" shall mean, with respect to Sellers the actual knowledge of Alex Halimi and Saul Mazor, principals of the Sellers, and with respect to Purchaser the actual knowledge of the investors of Purchaser and (vii) when calculating the period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day.

13.10.    Severability.    If any provision of this Agreement is held to be illegal, invalid, or unenforceable by a court of competent jurisdiction, the legality, validity, and enforceability of the remaining provisions shall not be affected thereby, and in lieu of each such illegal, invalid, or unenforceable provision, the parties shall negotiate in good faith to add a provision similar in terms to such illegal, invalid or unenforceable provision as may be possible while giving effect to the benefits and burdens for which the parties have bargained hereunder.

13.11.    Negotiated Agreement.    Sellers and Purchaser acknowledge that it has been advised and represented by counsel in the negotiation, execution, and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

13.12.    Notices. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows:

(a)    if sent by registered or certified mail in the United States return receipt requested, upon receipt;

(b)    if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), one Business Day after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. in Philadelphia, when transmitted and receipt is confirmed; (d) if sent by facsimile transmission after 5:00 p.m. in Philadelphia and receipt is confirmed, on the following Business Day; and (e) if otherwise actually personally delivered, when delivered, provided that such notices, requests, demands, and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

| | |
|---|---|
| Purchaser: | DIO Industrials LLC |
| | c/o Barry Schinttman |
| | PO Box 810215 |
| | Boca Raton FL 33481 |
| | |
| Sellers: | Penn Treaty Homes LLC |
| | 1121 Pier Village LLC |
| | c/o Alex Halimi |
| | 93-16 71st Drive |
| | Forest Hills, NY 11375-6709 |
| | |
| with a copy to: | Edmond M. George, Esquire |
| | Obermayer Rebmann Maxwell & Hippel LLP |
| | Suite 3400 |
| | 1500 Market Street |
| | Philadelphia PA 19103. |

Any party hereto may change its address for service from time to time by notice given to other parties hereto in accordance with the foregoing.

13.13.  <u>Counterparts; Facsimile Copies</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signed facsimile copies of this Agreement shall legally bind the parties to the same extent as original documents.

(REMAINDER OF PAGE LEFT INTENTIONALLY BLANK – SIGNATURES ON FOLLOWING PAGE)

PENN TREATY HOMES LLC


Dated:                          By    _____
                                      Gotham Bedrock LLC, Managing Member
                                      Alex Halimi, Manager


1121 PIER VILLAGE LLC


Dated:                          By    _____
                                      Gotham Deeds LLC, Managing Member
                                      Alex Halimi, Manager




DIO Industrials LLC


Dated:                          By    _____
                                      Barry Schinttman, Manager


25