**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **In re:** | : | |
| | : | **Chapter 11** |
| **1121 PIER VILLAGE LLC,** | : | |
| **PENN TREATY HOMES LLC,** | : | **Lead Case No. 21-11466-ELF** |
| **2626 FRANKFORD LLC,** | : | |
| **285 KINGSLAND LLC,** | : | **Jointly Administered** |
| **231 E 123 LLC,** | : | |
| **193 HANCOCK LLC,** | : | |
| | : | |
| **Debtors.** | : | |
| | : | |

**DEBTOR'S MOTION FOR ENTRY OF ORDERS (A) APPROVING BID PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS, (B) SCHEDULING HEARING TO CONSIDER SALE AND APPROVING FORM AND MATTER OF NOTICES, (C) APPROVING EXPENSE REIMBURSEMENT PROVISION AND BREAK-UP FEE, (D) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (E) APPROVING ASSET PURCHASE AGREEMENT, (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACTS AND (G) GRANTING RELATED RELIEF**

Debtor 2626 Frankford LLC (the "Debtor"), by and through its counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby moves, pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 6004-1, and 9014-3 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Rules") for the entry of an Order: (i)(a) approving bid procedures (the "Bid Procedures") for the sale of substantially all of the assets of 2626 Frankford LLC as set forth below, (b) scheduling a hearing to consider the sale and approving the form and matter of notices, (c) approving the Expense Reimbursement and Break-Up Fee (both as defined below) and

(d) granting related relief; and (ii)(a) authorizing the sale free and clear of all liens, claims, encumbrances and interests, (b) approving the Asset Purchase Agreement (defined below) between the Debtor and Purchaser (or such other asset purchase agreement as may be selected at the Auction as the highest and best offer), (c) authorizing the assumption, sale and assignment of certain executory contracts, post-petition contracts and unexpired leases, and (d) granting related relief (the "Motion"). In support of the relief requested herein, the Debtor respectfully represents as follows:

## I.    **JURISDICTION**

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.    Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, and 9014, and Local Rule 6004-1 and 9014-3.

4.    The Debtor consents to the entry of a final order or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## II.    **BACKGROUND**

### A.    **General Background**

5.    On May 23, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").

OMC\4833-5496-2424.v1-9/1/21

6.      On the same day, affiliated entities 1121 Pier Village LLC, Penn Treaty Homes LLC, 193 Hancock LLC, 231 E 123 LLC and 285 Kingsland LLC also filed voluntary chapter 11 petitions.  The cases of all six (6) entities are jointly administered.

7.      No request has been made for the appointment of a trustee or examiner in the Debtors' chapter 11 cases.

8.      The United States Trustee has not appointed an Official Committee of Unsecured Creditors in any of the debtors' bankruptcy proceedings.

9.      The factual background relating to the Debtor's commencement of these chapter 11 cases is set forth in detail in the May 27, 2021, complaint commencing 1121 Pier Village LLC et al. v. Sharestates Intercap Line LLC et al., Adversary No. 21-44-elf (the "Complaint"), incorporated herein by reference.

10.      As set forth extensively in the Complaint, each of the debtors is a single-asset real estate entity that owns real estate development projects in varying stages of development ranging from raw land to nearly completed projects.

11.      As described more extensively in the Complaint, Sharestates Intercap Line LLC and/or its affiliated entities ("Sharestates") served as secured construction lender for all debtors' real estate development projects.

12.      Sharestates served as the primary construction financing lender for all debtors' projects.

13.      The loans to each Debtor were cross-defaulted, meaning a default by any Debtor would allow Sharestates to accelerate the loans and begin foreclosure against all other debtors.

14.      Over the course of their lender-borrower relationship, Sharestates committed acts of lender liability, including, upon information and belief, fraudulently representing that funds

3

would be available timely for construction draws when Sharestates did not have those funds available, unilaterally changing the contractual draw process in breach of its duties and threatening to foreclose on debtors that were not in default of contractual payments in order to extract concessions on larger debtors.

15.     The misconduct described in the Complaint caused the failure of all debtors' development projects and necessitated the instant bankruptcy filings.

16.     Since the Petition Date, the Debtor has engaged in substantial negotiations with various interested parties and have entered into, subject to Court approval, an asset purchase agreement with a stalking horse purchaser to effectuate a sale of substantially all of the assets of the Debtor in an effort to maximize the return to all of the Debtor's stakeholders.

**B.      The Proposed Sale Process**

14.     The Debtor believes that a sale of all or substantially all of their assets offers the highest potential recovery for all stakeholders and the best prospects for the continued operation of the Debtor's business under new ownership.

15.     To this end, the Debtor entered into extensive negotiations with several potential purchasers and have negotiated a stalking horse asset purchase agreement.

16.     The Debtor seeks to market their assets for sale consistent with these agreements, and will seek to employ real estate consultants Keen Realty LLC ("Keen") to do so by a separate application.

17.     The Debtor has tasked Keen to undertake a comprehensive search to identify any and all potential buyers and to conduct a competitive sale process.  Keen has performed a comprehensive review of the marketplace and is prepared to contact potential buyers.

OMC\4833-5496-2424.v1-9/1/21

18.    In these negotiations, the Debtor has reached an agreement with 724 Group Investments, LLC or its designee (the "Purchaser") and agreed to a proposed sale of the assets of the Debtor, with the Purchaser serving as the stalking horse bidder (the "Sale").

19.    Specifically, as a result of the negotiations between the Debtor and the Purchaser, the Purchaser has agreed to pursue a sale of substantially all of its assets (the "Assets"), subject to and pursuant to an asset purchase agreement (the "Asset Purchase Agreement") and the Bid Procedures detailed herein.

20.    The Purchaser and/or an associated entity will provide a DIP loan in an amount of up to $800,000.00 to provide funds to employ Keen to conduct extensive marking in order to maximize the realizable value for the estates.  The Debtor will seek approval of that DIP loan via a separate contemporaneous motion.

21.    In order to assure that the highest and best value is achieved, once the Bid Procedures Order is entered, the Debtor, through the efforts of Keen, will continue to market the Assets to other potential purchasers in accordance with the Bid Procedures prior to the Debtor's proceeding with an auction and sale approval before this Court.

C.    **The Proposed Sale**

22.    The real property owned by Debtor at 2626 Frankford Avenue, Philadelphia PA 19125 (the "Real Property") is effectively raw land, ready for construction into a mixed-use building along a busy commercial corridor.

23.    The Real Property is substantially all of the Assets.

24.    The Real Property is encumbered by a mortgage held by Sharestates in an amount that purportedly exceeds the current fair market value.

OMC\4833-5496-2424.v1-9/1/21

25.     Given these existing alleged encumbrances, even after completion of construction, these Debtor will be entirely unable to reorganize and restructure their debt to a level that can be funded from ongoing operations.

26.     The Debtor has extensively explored their reorganizational options regarding the Real Property and has elected in the sound exercise of their business judgment to sell the Assets, along with other related assets, pursuant to the Asset Purchase Agreement.

27.     The Debtor believes that it is in the best interests of their estate to enter into the Asset Purchase Agreement.  A copy of the Asset Purchase Agreement is attached as **Exhibit "A"** hereto.    The  following  sub-paragraphs  summarize  key  provisions  of  the  Asset  Purchase Agreement, but are qualified in their entirety by reference to the actual agreement:

     a.  <u>Purchase Price</u>.    (a) The  purchase  price  of  the  Assets  is $400,000.00,  in  cash  less  the  Assumed  Liabilities.    A  portion  of which  cash  purchase  price  may  be  in  the  form  of  a  credit  bid arising from a DIP loan provided by the Purchaser or an associated entity.

     b.  <u>Good Faith Deposit</u>. Upon approval of the Bid Procedures Order, Purchaser  shall  deposit  $12,000.00  in  escrow  (the  "Deposit") pursuant to the terms of an escrow agreement that will be entered into  among  the  parties  and  an  escrow  agent  on  or  before  the execution  of  the  Asset  Purchase  Agreement.    The  Deposit  shall become  non-refundable  and  released  to  Seller  in  the  event  that the Asset Purchase Agreement is terminated on account of a material breach by Buyer, in which case the Deposit shall be deemed to be liquidated damages and Seller's sole and exclusive remedy.

     c.  <u>Sale of Acquired Assets.</u> Subject to the terms and conditions of the Asset Purchase Agreement, at Closing the Seller shall sell, assign, convey, transfer and deliver to Purchaser Seller's right, title and interest in the Assets on an "as is" "where is" basis, without any warranty express or implied as to the condition thereof except as provided therein, and Purchaser shall purchase Seller's right, title and interest in and to the Assets, free and clear of all claims, interests  and  Encumbrances  other  than  the  Permitted Encumbrances and Assumed Liabilities. As used therein, the term "Assets"  means  all  of  Seller's  right,  title  and  interest  in  the following:

OMC\4833-5496-2424.v1-9/1/21

    i. all Real Property, together with all buildings, structures, improvements, and other appurtenances thereto and thereon;

    ii. all interests of Seller in the Assumed Contracts;

    iii. any and all claims and causes of action of Seller or its Chapter 11 estate against third parties, including, without limitation, all Avoidance Actions.  For the avoidance of doubt, this sale shall not convey any causes of action of the Seller that are asserted in <u>1121 Pier Village LLC et al. v. Sharestates Intercap Line LLC et al.</u>, Adversary No. 21-44-elf, which causes of action are an Excluded Asset;

    iv. all Permits that relate to the Real Property;

    v. all rights of any Seller relating to customer deposits and prepaid charges and expenses, and claims for refunds relating to the Assets;

    vi. all books and records, files, data, reports, computer codes, and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, accounting and tax files, personnel records, and other records of any Seller or related to the operations of any Seller and/or the Business;

    vii. Notwithstanding anything to the contrary contained in the Asset Purchase Agreement, Purchaser shall have the right, upon written notice given to Seller before Closing, to exclude any or all of the assets listed above from the definition of Assets and any assets so excluded shall be Excluded Assets; provided, however, that any such exclusion of assets shall not give rise to an adjustment of the Purchase Price.

d. <u>Assumed Liabilities.</u> Effective upon Closing, the Purchaser shall assume (a) all obligations of the Seller arising on or after the Closing Date under the Assumed Contracts, and (b) other Seller obligations, if any, enumerated in the Asset Purchase Agreement (the foregoing are collectively referred to as the "<u>Assumed Liabilities</u>").

e. <u>Excluded Assets.</u> The following assets are not a part of the sale and purchase contemplated by the Asset Purchase Agreement and are excluded from the Assets (collectively, the "<u>Excluded Assets</u>"):

OMC\4833-5496-2424.v1-9/1/21

    i. all cash and cash equivalents of Seller (other than the Restricted Cash);

    ii. third-party assets;

    iii. privileged documents;

    iv. federal income tax refunds;

    v. any Contracts other than the Assumed Contracts;

    vi. the Purchase Price;

    vii. all rights, claims, and causes of action of Sellers relating to this Agreement;

    viii. all corporate minute books, stock transfer books, the corporate seal of a Seller and all other corporate books and records relating to Seller's organization and existence; and

    ix. any equity interests in a Seller.

    x. Any causes of action of the Seller that are asserted in 1121 Pier Village LLC et al. v. Sharestates Intercap Line LLC et al., Adversary No. 21-44-elf.

f. <u>Excluded Liabilities.</u> Under no circumstance shall Purchaser assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to any of the Excluded Liabilities, including the following, which shall be and remain liabilities of Seller:

    i. Liabilities which are not Assumed Liabilities;

    ii. Liabilities associated with any Excluded Assets;

    iii. Liabilities associated with any and all indebtedness of any Seller for borrowed money not included in the Assumed Liabilities;

    iv. Liabilities arising out of or in connection with claims, litigation, and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date (other than as set forth in <u>Section 2.3</u> hereof);

    v. penalties, fines, assessments, settlements, interest, costs, and expenses arising out of or incurred as a result of any

8

actual or alleged violation by any Seller of any Law prior to the Closing Date;

vi.  All Liabilities for expenses (i) relating to the negotiation and preparation of this Agreement and (ii) relating to the Transactions, in each case to the extent incurred by Seller and including those related to legal counsel, accounting, brokerage, and investment advisors fees and disbursements;

vii.  Any Liabilities related to the Permitted Encumbrances.

g.  Closing. Subject to the satisfaction of the conditions set forth in the Asset Purchase Agreement (or the waiver thereof by the party entitled to waive that condition), the closing of the Transactions (the "Closing") will take place at the offices of Obermayer Rebmann Maxwell & Hippel LLP, Centre Square West, 1500 Market Street, 34th Floor, Philadelphia, PA 19102 (or at such other place as the parties may designate in writing) at 10:00 a.m. (Philadelphia, Pennsylvania time) on the Closing Date.

h.  Termination. The rights of the Seller and Purchaser to terminate the Agreement are set forth in Sections 8 and 9 of the Asset Purchase Agreement.

i.  Break-Up Fee and Expense Reimbursement. If the Seller accepts an overbid from someone other than the Purchaser, or if the Asset Purchase Agreement is terminated as a result of a breach by Seller, Purchaser shall be entitled to a break-up fee of $4,000.00 ("Break-Up Fee").

Purchaser shall be entitled to expense reimbursement to be paid to the Purchaser for its reasonable, documented out-of-pocket third-party expenses incurred in connection with being the stalking horse bidder, including its reasonable expenses to perform due diligence and other costs associated with the proposed Transaction in an aggregate amount not to exceed $6,000.00 (the "Expense Reimbursement").

The Break-Up Fee and Expense Reimbursement shall be a super-priority administrative claim in the bankruptcy cases and shall be paid upon the closing of the successful bid transaction and from the proceeds of sale or within five (5) business days after the termination of the Asset Purchase Agreement.

j.  Credit Bids Limited.   The Asset Purchase Agreement is conditioned on the Court's grant of the Motion to Limit Credit Bidding pursuant to 11 U.S.C. §363(k) limiting or eliminating the

right of Sharestates to credit bid, filed contemporaneously with the Motion.

28.     The Debtor believes that the Sale will provide the best means to maximize value for all of its constituencies.  Upon approval of the Bid Procedures, the Debtor, with the assistance of Keen, will continue to market its assets to and negotiate with all potential purchasers, including the Purchaser, in an effort to achieve maximum value for the benefit of all of its constituents.

29.     As described above, the Debtor, after efforts to maximize value, a review of various reorganization, liquidation and sale options, and discussions with their professionals, determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtor's estate for the benefit of all stakeholders would be (i) to enter into the Asset Purchase Agreement subject to higher and better bids and (ii) to proceed with the Sale process.  Accordingly, the Debtor believes that the proposed Sale will maximize the value of the Debtor's assets for all stakeholders.

### D.     **Proposed Bid Procedures**

30.     The Bid Procedures, as summarized below, were developed in a manner consistent with the objective of promoting active bidding that will result in the highest or best offer for the Assets while affording appropriate protection for the Purchaser.  Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled but fair and open fashion that promotes interest in the Assets by financially-capable, motivated bidders who are likely to close on the transaction.

31.     The Debtor seeks to conduct an open sales process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Asset

Purchase Agreement, for the purchase of the Assets, free and clear of liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching to the sale proceeds.

32.     Attached as **Exhibit "1"** to the Bid Procedures Order are the proposed Bid Procedures applicable to the Sale. The Bid Procedures provide: (i) the date, time, and place at which the Auction will be conducted; (ii) that each bidder participating in the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (iii) that the Auction will be conducted openly; and (iv) that bidding at the Auction will be transcribed.  The Bid Procedures are typical for asset sales of this size and nature and require a refundable, good faith deposit and that a bidder be a "Qualified Bidder," as defined in the Bid Procedures.

33.     The following paragraphs summarize key provisions of the Bid Procedures.  In the event of any conflict between the summary description below and the actual Bid Procedures, the actual Bid Procedures control.

a.  Participation Requirements. In order to participate in the bidding process and obtain due diligence access, a potential bidder must first deliver (i) an executed confidentiality agreement in form and substance satisfactory to the Debtor; and (ii) financial disclosures acceptable to the Debtor and their real estate consultant Keen Realty LLC demonstrating such potential purchaser's ability to close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned.

b.  Qualified Bid. To be eligible to participate in the bidding process, each Qualified Bidder, other than the Purchaser, must deliver to the Debtor, counsel to the Debtor, and Keen:

i.  An executed copy of an asset purchase agreement (including schedules and exhibits, the "Modified Asset Purchase Agreement"): (a) marked to reflect changes to the Asset Purchase Agreement (b) irrevocable until the earlier of 30 days after the Auction or two business days after a proposed Sale is consummated and (c) for the purchase of

11

substantially all of the Assets, with no closing conditions other than those set forth in the Asset Purchase Agreement, in exchange for a cash purchase price that exceeds the Purchase Price plus the Break-Up Fee plus the Expense Reimbursement by at least $10,000.00.

    ii.    Financial and other information satisfactory to the Debtor setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code, with respect to any Assumed Contracts, and financial capacity to consummate the proposed transaction.

c.    <u>Bid Deadline</u>. The deadline for submitting a Qualified Bid, other than the Purchaser, shall be no later than **October 29, 2021.** (Prevailing Eastern Time) (the "<u>Bid Deadline</u>"). A bid received after the Bid Deadline shall not constitute a Qualified Bid.

d.    <u>Auction.</u> In the event that the Debtor receives one or more Qualified Bids by the Bid Deadline and the Debtor concludes that any of such Qualified Bids is a higher and better bid than the Asset Purchase Agreement, the Debtor shall conduct an Auction of the Assets to determine the highest or otherwise best bid with respect to the Assets. The Auction shall commence at 10:00a.m. (Prevailing Eastern Time) on November 3, 2021 at the offices of Obermayer Rebmann Maxwell & Hippel LLP, Centre Square West, 1500 Market Street, 34th Floor, Philadelphia, PA 19102. The following procedures, which are qualified in their entirety by reference to the Bid Procedures, shall govern any Auction:

    i.    Only a Qualified Bidder who has submitted a Qualified Bid (including the Purchaser) shall be eligible to attend and participate at the Auction.

    ii.    Each Qualified Bidder shall be required to verbally confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale.

    iii.    The Auction shall begin with the highest and best Qualified Bid proceed in minimum additional increments of $150,000.00.

    iv.    Each bid at the Auction must meet each of the criteria of a Qualified Bid, other than the requirement that it be received prior to the Bid Deadline.

OMC\4833-5496-2424.v1-9/1/21

v.  All bids shall be placed on the record, which shall either be transcribed or videotaped, and each bidder shall be informed of the terms of the previous bid.

vi.  The Auction shall continue until there is only one offer that the Debtor, and their advisors (including counsel and Keen), determine is the Successful Bid.  In determining which Qualified Bid to select as the Successful Bid, the Debtor, and their advisors (including counsel and Keen), may consider, among other things, (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; and (4) the net benefit to the Debtor's estates and creditors.  The Debtor shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.

vii.  The Debtor, and their advisors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in its reasonable discretion, will better promote the goals of the Auction and that are consistent with any of the provisions of the Bid Procedures Order; provided, however, that the Debtor may not without the consent of the Purchaser modify (1) the dates set for the Bid Deadline, the Auction or the Sale Hearing; (2) the definition of a Qualified Bid.

e.  Sale Hearing. The Sale Hearing shall be conducted in the courtroom of the Honorable Eric Frank in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Courtroom 1, 2nd Floor, Philadelphia, PA 19107 on November 5, 2021 or on such other date as the Court may direct.

f.  Modifications. In addition to the rights set forth in section 8(vii) of the Bid Procedures, the Debtor and their advisors may modify the Bid Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the proposed Sale if in their reasonable judgment such modifications would be in the best interest of the Debtor's estates and promote an open and fair sale process, so long as such modifications and/or additional terms are consistent with the provisions of the Asset Purchase Agreement.

52.  Notwithstanding any provision contained herein, the Purchaser is deemed to be a Qualified Bidder.

### E.     Break-Up Fee and Expense Reimbursement to Purchaser

53.     In recognition of the Purchaser's substantial expenditure of time, energy, resources, and the benefit to the Debtor's estate of securing a "stalking horse" or guaranteed minimum bid, the Debtor seeks approval to pay the Break-Up Fee of $4,000.00, and the Expense Reimbursement in the amount not to exceed $6,000.00 to the Purchaser in the event that: (i) the Purchaser is not the Successful Bidder at the Auction; (ii) the Debtor withdraws this Motion subsequent to the entry of the Bid Procedures Order (as defined herein); and (iii) as otherwise provided in the Asset Purchase Agreement.

54.     The Break-Up Fee and Expense Reimbursement are required by the Asset Purchase Agreement. The Debtor believes that the Break-Up Fee and Expense Reimbursement are fair and reasonable given the benefit to the estate of having a definitive Asset Purchase Agreement and the risk to the Purchaser that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of the Debtor's' estate.

55.     The Asset Purchase Agreement and the Purchaser's monetary offer will form the basis upon which other bids will be submitted and evaluated. The establishment of both the Break-Up Fee and Expense Reimbursement permit the Debtor to insist that competing bids for the Assets be higher or otherwise better than the purchase price under the Asset Purchase Agreement, which is a clear benefit to the Debtor's estate. Thus, even if the Purchaser is ultimately not the Successful Bidder and the Purchaser is paid the Break-Up Fee and Expense Reimbursement, the Debtor will still have benefited significantly from the Asset Purchase Agreement due to the floor established by the Purchaser leading to an improved bid and the increased likelihood that the Assets will be sold at the highest value to the Debtor's' estate.

### F.     Notice of Auction of Assets

14

56.     Based on the time deadlines contained in the Asset Purchase Agreement, the Debtor seeks to have the Auction scheduled for a date no later than November 3, 2021.  It is imperative to move forward with the Auction and the Sale promptly because the Debtor has limited financing available to them.

57.     The Debtor will serve by first class mail, postage prepaid, copies of the Auction and Sale Notice, a copy of which is attached to the Bid Procedures Order as **Exhibit "3"** upon the following entities: (i) the Debtor's top twenty (20) unsecured creditors; (ii) the Office of the United States Attorney for the Eastern District of Pennsylvania; (iii) counsel to Sharestates; (iv) counsel to the Purchaser; (v) Keen; (vi) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Assets; (vii) all taxing authorities or recording offices which have a reasonably known interest in the Assets, including, but not limited to the Commonwealth of Pennsylvania and the City of Philadelpahi and the Internal Revenue Service; (viii) the Environmental Protection Agency; (ix) the state/local environmental agencies in the jurisdictions where the Debtor owns or leases real property; (x) all counterparties to contracts with the Debtor related to the Assets; (xi) all entities known to have expressed a bona fide interest in acquiring all or portions of the Assets; (xii) the Office of the United States Trustee for the Eastern District of Pennsylvania; (xiii) the Securities and Exchange Commission; (xiv) the 2002 List; (xv) parties on the Matrix filed by the Debtor; and (xvi) all of the Debtor's equity holders.

58.     In addition, as soon as possible after the entry of a Bid Procedures Order, but in any event no later than seven (7) days after the entry of such Order, the Debtor shall cause the Auction and Sale Notice to be published, as soon as practicable, in one (1) daily edition of either

the Wall Street Journal, USA Today, national editions, or such other similar national publication

selected by the Debtor.

59.      The Debtor further requests, pursuant to Bankruptcy Rule 9014, that objections,

if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the

Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the Eastern

District of Pennsylvania; and (d) be served so as to be received by:

     a.  the Debtor;

     b.  counsel to the Debtor;

     c.  counsel to Sharestates;

     d.  the Office of the United States Trustee;

     e.  counsel to the Purchaser; and

     f.  all parties entitled to notice pursuant to Bankruptcy Rule 2002, no later than two
       (2) business days prior to the Sale Hearing.

    **G.**   **Assumption, Assignment, and Cure Procedures**

60.      In order to both facilitate and effect the Sale, the Debtor may be required to

assume and assign the Assumed Contracts to the Purchaser, or as applicable, to a Successful

Bidder pursuant to Section 365 of the Bankruptcy Code.

61.      The Debtor seeks to establish (a) procedures for determining cure amounts

through the closing date of the Sales (the "Cure Amounts"), and (b) the deadline for objections to

the assumption and/or assignment of contracts to be assumed and/or assigned in connection with

the Sales (collectively, the "Assumption and Assignment Procedures"). The Assumption and

Assignment Procedures are attached as **Exhibit "2"** to the Bid Procedures Order.

62.      Within five (5) business days of the entry of the Bid Procedures Order, the Debtor

shall file a schedule (the "Contract & Cure Schedule"):

a.  listing the Assumed Contracts, (b) listing the amount, if any, necessary to pay to cure such Assumed Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts"), (c) designating which of the Assumed Contracts have been designated for assumption and assignment by the Purchaser, (d) stating that the Purchaser has the right to delete any Assumed Contract initially designated for assumption and assignment from the final list of Assumed Contracts to be assumed and assigned at any time up to three (3) days prior to the Auction, and (e) stating that, in the event a bidder other than the Purchaser is the Successful Bidder, such other party has the right to designate Assumed Contracts for assumption and assignment that may be different than the contracts initially designated by the Purchaser and such Assumed Contracts will be set forth in a supplemental Contract Schedule (the "Supplemental Contract Schedule") to be served and filed within two (2) days after the Auction.

b.  Upon filing the Contract & Cure Schedule, a copy of the Contract & Cure Schedule, the Motion and all exhibits related thereto, the Auction and Sale Notice, the Bid Procedures Order, the Bid Procedures, and these Assumption and Assignment Procedures (collectively, a "Cure Package"), will be served on each of the counterparties to the Assumed Contracts.

63.  To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assumed Contracts, the Debtor proposes the following deadlines and procedures:

a.  Any objections ("Assignment Objections") to the assumption and assignment of any Assumed Contract, including, but not limited to, objections relating to adequate assurance of future performance of the Purchaser or to the proposed Cure Amount set forth in the Contract & Cure Schedule, must be filed with the Bankruptcy Court and served upon counsel for the Debtors, Obermayer Rebmann Maxwell & Hippel LLP, Obermayer Rebmann Maxwell & Hippel LLP, Centre Square West, 1500 Market Street, Suite 3400, Philadelphia PA 19102, Attn: Edmond M. George, Esquire, counsel to the relevant Purchaser, and the Office of the United States Trustee, Office of The United States Trustee, Custom House, 200 Chestnut Street, Suite 502, Philadelphia, PA 19106 no later than eleven (11) days after service of the Cure Package (the "Sale and Assignment Objection Deadline"). Notably, *all* Assignment Objections based on the Debtor's proposed Cure Amounts must be filed by the Sale and Assignment Objection

Deadline, even if the Successful Bidder at Auction is not the Purchaser. Assignment Objections will be heard at the Sale Hearing unless otherwise agreed to by the applicable parties or ordered by the Court.

b. If the Successful Bidder at Auction is *not* the Purchaser, Assignment Objections relating *only* to adequate assurance of future performance shall be filed with the Bankruptcy Court and served upon counsel for the Debtor, Obermayer Rebmann Maxwell & Hippel LLP, Obermayer Rebmann Maxwell & Hippel LLP, Centre Square West, 1500 Market Street, Suite 3400, Philadelphia PA 19102, Attn: Edmond M. George, Esquire, counsel to the Successful Bidder, and the Office of the United States Trustee, Office of The United States Trustee, Custom House, 200 Chestnut Street, Suite 502, Philadelphia, PA 19106 no later than eleven (11) days after service of the Supplemental Contract Schedule. A hearing to resolve any such objections will be held on a date to be determined.

c. Any counterparty to an Assumed Contract failing to file an Assignment Objection by the Sale and Assignment Objection Deadline shall be forever barred from (1) objecting to the Cure Amount set forth on the Contract Schedule with respect to its Assumed Contract; (2) seeking additional amounts arising under its Assumed Contract prior to the Closing from the Debtor, the Successful Bidder; (3) objecting to the assumption and assignment of its Assumed Contract to the Successful Bidder; and (4) objecting to the adequate assurance to be provided by the Successful Bidder.

d. Any counterparty to an Assumed Contract failing to file an Assignment Objection based on a Successful Bidder's adequate assurance within eleven (11) days after service of the Supplemental Contract Schedule shall be forever barred from objecting to the adequate assurance of future performance provided by the Successful Bidder.

e. Except as may otherwise be agreed to by all parties to an Assumed Contract, the cure of any defaults under Assumed Contracts necessary to permit assumption and assignment thereof in accordance with section 365 of the Bankruptcy Code shall be by (1) payment of the undisputed Cure Amount, and/or (2) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be the party set forth in the applicable asset purchase agreement or, if

applicable, in an agreement between the Successful Bidder and the Debtor.

64.    To the extent the Cure Amount for any Assumed Contract has been established by final order prior to the Closing Date, such amount shall be paid by the Debtor to the counterparty to such Assumed Contract on the Closing Date.

65.    To the extent the Cure Amount for any Assumed Contract has not been established by final order prior to the Closing Date, the maximum cure amount claimed by the counterparty (the "Disputed Cure Amount") shall be paid by the Debtor on the Closing Date to an escrow agent mutually agreed to by the Purchaser and the Debtor (the "Escrow Agent"), who shall hold the Disputed Cure Amount in accordance with the terms of a mutually acceptable escrow agreement (the "Cure Escrow Agreement") and who shall hold and distribute the Disputed Cure Amount and interest and gains thereon in accordance with the terms of the Cure Escrow Agreement.  The Purchaser shall have no liability for any Cure Amounts.

66.    To the extent a counterparty believes that an Assumed Contract requires such counterparty's consent to the assignment of such Assumed Contract to that Successful Bidder, such non-debtor party must raise this issue in its Assignment Objection.  If no timely Assignment Objection is filed, such other non-debtor parties to an Assumed Contract shall be barred and estopped from asserting or claiming that their Assumed Contract contains an enforceable consent right.

## H.    Corporate Action

67.    The Debtor further requests that no further corporate action of the Debtor or approval of any Debtor's equity security holders shall be required to authorize the Debtor to consummate the transactions contemplated by the Asset Purchase Agreement. Except as expressly permitted by any Orders granting this Motion, the Debtor requests that all holders of

claims against and interests in, and equity security holders of the Debtor be forever barred, estopped, and enjoined from commencing, prosecuting, or continuing in any manner any action or other proceeding of any kind against the Debtor's employees, officers or directors, or their professionals and advisors, on account of or related to the Asset Purchase Agreement or the transactions contemplated thereby, *provided, however,* that nothing in any Order granting this Motion shall prevent any administrative agencies, governmental, tax, and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

## III.    **RELIEF REQUESTED**

68.    By this Motion, the Debtor is seeking entry of orders pursuant to sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007 and 9014 and Local Rules 2002-1, 6004-1, and 9014-3:

69.    An order, substantially in the form annexed hereto as **Exhibit "B"** (the "Bid Procedures Order"): (a) approving the Bid Procedures relating to the Sale, (b) scheduling a hearing to consider the Sale (a "Sale Hearing") and approving the form and matter of notices, (c) approving the Expense Reimbursement and Break-Up Fee and (d) granting related relief;

70.    An order, substantially in the form annexed hereto as **Exhibit "C"** (the "Sale Order"): (a) authorizing the Sale of the Assets, free and clear of all liens, claims, encumbrances and interests, (b) approving the Asset Purchase Agreement (or such other asset purchase agreement as may be selected at the Auction as the highest and best offer); (c) authorizing the assumption, sale, and assignment of certain executory contracts, post-petition contracts, and unexpired leases, and (d) granting related relief.

## IV.    BASIS FOR RELIEF REQUESTED

### A.    There is a Compelling Business Justification for the Sale Because It Will Maximize Value to the Debtor's Estate.

71.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). Section 105(a) of the Bankruptcy Code, in turn, provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

72.    Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. Courts hold that the sale or use of property outside the ordinary course of business should be approved where the debtor can articulate a business justification for the transaction. See Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re CPJFK, LLC, No. 10- 50566-CEC, 2011 WL 1257208, at *10-13 (Bankr. E.D.N.Y. Mar. 30, 2011); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Ionosphere Clubs, Inc., 100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989).  Accordingly, even the entirety of a debtor's business may be sold prior to plan confirmation "where there is a good business reason to do so." In re General Motors Corp., 407 B.R. 463, 489-90 (Bankr. S.D.N.Y. 2009) (discussing Lionel).

73.    In determining whether a sound business justification exists, courts have considered the following factors: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration has been provided; (iii) whether the

transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice has been provided. See Lionel, 722 F.2d at 1071 (setting forth the "sound business purpose" test); In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the articulated business justification test of Lionel and adding the "good faith" requirement); Delaware & Hudson, 124 B.R. at 176 (adopting Lionel).

74.     Courts have made it clear that a showing of a sound business justification need not be exhaustive, but rather a debtor is "simply required to justify the proposed disposition with sound business reasons."  In re Baldwin United Corp., 43 B.R. 898, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a sale depends upon the facts and circumstances of each case.  Lionel, 722 F.2d at 1071; see Industrial Valley Refrig. & Air Conditioning Supplies, Inc., 77 B.R. 15 (Bankr. E.D.Pa 1987) (adopting Lionel reasoning). When considering whether a debtor has demonstrated a sound business justification for a proposed sale of assets under §363(b) of the Bankruptcy Code, court "should consider all salient factors pertaining to the proceeding."  Lionel, 722 F.2d at 1071.  In evaluating these and other pertinent factors, the court should bear in mind that the overriding goal is "to further the diverse interests of the debtor, creditors and equity holders, alike."  Id.

75.     The Debtor submits that sound business justification exists to sell the Assets to the Purchaser, or the Successful Bidder, pursuant to the Bid Procedures.  The Debtor cannot restart construction, and real estate tax liabilities will continue to mount unless the Real Property is sold.

76.     By a separate motion, the Debtor seeks approval of a DIP loan that will allow to market the Assets.  Without a clear exit strategy such as the proposed Sale, the Debtor risks running out of cash and thus being left irrevocably insolvent such that no beneficial sale can

occur. Thus, the relief sought herein is not only reasonable but necessary to maximize the value of the Debtor's estate for the benefit of all stakeholders.

77.     Moreover, the Bid Procedures are designed to maximize the value received for the Assets. The process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtor while providing bidders with ample time and information to submit a timely bid and perform due diligence. The Bid Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price. The Debtor is subjecting the value of the Assets to market testing and permitting prospective purchasers to bid on the Assets. Consequently, the fairness and reasonableness of the consideration paid by the winning bidder will be demonstrated through a market check, which is the best means of establishing that a fair and reasonable price is being paid.

78.     The notice of Auction is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Assets. The notice will explain the Bid Procedures, the Auction process, and the terms of the proposed Sale contemplated by the Asset Purchase Agreement. Indeed, the Debtor has and, upon approval of the Bid Procedures, will continue to market the Acquired Assets and solicit the most likely interested competing bidders. The Debtor submits that such notice is sufficient for entry of the Sale Order and satisfies requisite notice conditions for approval of the Sale under Section 363(b) of the Bankruptcy Code.

79.     Under these circumstances, a compelling business justification exists for the immediate sale of the Assets outside the ordinary course of business and prior to confirmation of a plan of reorganization. Accordingly, the Debtor submits that the proposed sale of the Acquired Assets pursuant to section 363 of the Bankruptcy Code should be approved.

B.      **The Break-Up Fees and Expense Reimbursements are Reasonable and Appropriate.**

80.      Bid incentives such as the Break-Up Fees and Expense Reimbursements laid out in the Asset Purchase Agreement encourage a potential buyer to invest the time, money, and effort required to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process. The Debtor submits that approval of the Break-Up Fee and Expense Reimbursement are justified by the facts and circumstances of this case, whether considered under the business judgment rule or as an administrative expense of the estate.

81.      Courts have indicated that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

82.      Bid Protections are a normal and, in many cases, necessary components of sales conducted under the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . .  In fact, because the. . . corporation ha(s) a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize values.

Integrated Resources, 147 B.R. at 659-60 (emphasis in original). Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the

24

bidding by providing some form of compensation for the risks it is undertaking." 995 Fifth Ave.,

96 B.R. at 28 (quotations omitted). See also Integrated Resources, 147 B.R. at 660-61 (break-up

fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its

bid"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees,

bidders would be reluctant to make an initial bid for fear that their first bid will be shopped

around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due

diligence").

83.    As a consequence, courts frequently approve bid protections in connection with

proposed bankruptcy sales. Courts considering the propriety of proposed bid protections

typically consider "(1) whether the relationship of the parties who negotiated the fee is marked

by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding;

and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price."

In re Twenver, Inc., 149 B.R. 954, 956 (Bankr. D. Colo. 1992); accord, In re Bidermann Indus.

U.S.A., Inc., 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); Integrated Resources, 147 B.R. at 657.

84.    In Calpine Corp. v. O'Brien Envtl. Energy. Inc. (In re O'Brien Envtl. Energy.

Inc.), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit held

that although bid protections are measured against a business judgment standard in non-

bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section

503(b) apply to bid protections in bankruptcy cases. Accordingly, to be approved, bid protections

must provide post-petition benefit to the Debtor's estate. Id. at 533.

85.    The O'Brien Court identified at least two instances in which bid protections may

provide benefit to the estate. First, a benefit may be found if "assurance of a break-up fee

promoted more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited." <u>Id</u>. at 537. Second, when the availability of bid protections induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." <u>Id</u>.

86.     In this case, the proposed Bid Protections are appropriate under the "administrative expense" standard of <u>O'Brien</u>. The Break-Up Fee and Expense Reimbursement are the product of extensive efforts by the Debtor to market the Assets to all potentially interested buyers and resulted from arm's-length negotiations conducted in good faith between the Debtor and the Purchaser. The Break-Up Fee and Expense Reimbursement reflect the time spent, efforts made, and resources expended by the Purchaser and advisors in the due diligence and negotiation process that culminated in the Asset Purchase Agreement. In light of the incomplete nature of the construction on the Real Properties comprising the majority of the Assets, the Bid Protections were essential to securing the Purchaser's commitment to participate in the Auction as the "Stalking Horse bidder."

87.     The amount of the Break-Up Fee ($4,000.00) and Expense Reimbursement ($6,000.00) due to the Purchaser is appropriate in light of the Purchase Price and is not so high that it would cause any chilling effect on other prospective purchasers, and will not harm any creditors. This Break-Up Fee and Expense Reimbursement are reasonable and within "market" for such fees.

88.     Indeed, the Break-Up Fee and Expense Reimbursement induced the Purchaser to submit bids that will serve as a minimum floor on which the Debtor, its creditors, and other bidders may rely. Approval of the Bid Protections is all the more appropriate where, as here, the

Bid Protections will afford the Debtor the ability to shop the Assets for a higher or better offer without the risk of losing the Purchaser. See In re Global Crossing, Ltd., 295 B.R. 726, 745-46 (Bankr. S.D.N.Y. 2003). The Debtor's ability to do so would be eliminated, however, if the Break-Up Fee and Expense Reimbursement are not approved by the Bankruptcy Court. Absent authorization of the payment of the Break-Up Fee and Expense Reimbursement, the Debtor might lose the opportunity to obtain the highest and best available offer for the Assets and the downside protection that will be afforded by the Asset Purchase Agreement.

89.     Here, the Purchasers have provided a material benefit to the Debtor and their creditors in the form of a baseline value for the Assets, which increases the likelihood that the Auction will yield the best possible price. Both the Debtor and the Purchaser, as parties to the Asset Purchase Agreement, agree that the protections afforded by the Break-Up Fee and Expense Reimbursement are an integral part of the bargain. Accordingly, approval of the Bid Procedures, including the Break-Up Fee and Expense Reimbursement, is a bargained-for condition to the Purchaser's obligation to proceed with the Transaction as contemplated in the Asset Purchase Agreement. See In re Reliant Energy Channelview, L.P., 594 F.3d 200 (3d Cir. 2010).

90.     For the foregoing reasons, the Debtor requests: (1) that the payment of the Break-Up Fee and the Expense Reimbursement under the conditions set forth in the Asset Purchase Agreement be approved; and (2) that the Court approve and authorize payment of the Break-Up Fee and Expense Reimbursement pursuant to the terms of the Asset Purchase Agreement in the event that the Purchaser is not the Successful Bidder at the Auction.

### C.     The Sale is Proposed in "Good Faith" as Contemplated By §363(m) of the Bankruptcy Code.

91.     The Asset Purchase Agreement is the product of extensive arm's length negotiations between the Debtor and the Purchaser. In addition, the Debtor intends to negotiate

OMC\4833-5496-2424.v1-9/1/21

any other asset purchase agreement at arm's length and in good faith and, thus, believe that any

Successful Bidder, including the Purchaser, should be entitled to the protections of §363(m) of

the Bankruptcy Code.

92.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. §363(m).

93.     While the Bankruptcy Code does not define "good faith," the Third Circuit in

Abbotts Dairies held that:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted).

94.     Section 363(m) of the Bankruptcy Code thus protects a good faith purchaser of

assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its

interest in the purchased assets if the order allowing the sale is reversed on appeal.

95.     Here, the Debtor submits, and will present evidence at the Sale Hearing, if

necessary, that as set forth above, the Asset Purchase Agreement was an arm's length

transaction, in which the Successful Bidder acted in good faith. The Auction is an open sale

process, with the Assets to be sold to the bidder who submits the highest and best bid, and the

Debtor will have their own separate legal counsel to negotiate on its behalf throughout the

Auction and the Sale.  Accordingly, the Debtor requests that the Court make the finding at the Sale Hearing that the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**D.      The Sale Satisfies the Requirements of Bankruptcy Code §363(f) for a Sale Free and Clear of Liens, Claims, Interests, and Other Encumbrances.**

96.      Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if any of the following criteria are met: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien, and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. §363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that §363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

97.      In addition, several courts have held that section 363(f) grants bankruptcy courts the power to convey assets free and clear of all prepetition claims. See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) (collecting cases and discussing need to extinguish prepetition claims in order to facilitate the sale of assets for maximum value) ("Authorizing the sale [of debtor's assets] free and clear of...successor liability claims achieves the purpose of §363 intended by Congress.").

98.      The Assets are encumbered by three main types of liens or interests: tax liens owed to local taxing authorities, mechanic's liens, and mortgages.

99.    The Court may authorize a sale free-and-clear under §363(f)(5) if "the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest."  That is, if the claimant has no additional rights to equitable or specific relief, encumbered property may be sold free and clear of that interest.

100.    "The courts are divided, nevertheless, as to whether the statute requires a hypothetical payment that could fully satisfy the underlying debt. Compare, e.g., In re Healthco Int'l, Inc., 174 B.R. 174, 176 (Bankr. D.Mass. 1994) (holding that the terms "money satisfaction" mean "a payment constituting less than full payment of the underlying debt"), with Richardson v. Pitt County (In re Stroud Wholesale, Inc.), 47 B.R. 999, 1003 (E.D.N.C. 1985) (holding that the terms "money satisfaction" mean "full satisfaction of creditors' interests" in liquidation sales), aff'd per curiam, 983 F.2d 1057 (4th Cir. 1986) (unpublished disposition)." In re WBQ Partnership, 189 BR 97, 107 (Bankr. E.D.Va. 1995).

101.    The holders of a tax lien or a mechanic's lien claims have priority over the Sharestates mortgages because of the priming nature of their liens on real property and improvements thereto. Here, real property and improvements thereto comprise the vast majority of the Assets.

102.    Tax and mechanic's liens exist solely to guarantee payment to contractors and taxing authorities; holders of such claims can be compelled to accept monetary satisfaction of their claims and are not permitted to reject payment in full in favor of pursuing other remedies.

103.    The Stalking Horse bid by the Purchaser is $400,000.00 for the Sale, which represented a minimum market-tested value for the Assets.

OMC\4833-5496-2424.v1-9/1/21

104.    As such, the tax and mechanic's lien claimants are entirely assured of full payment upon the consummation of any Sale, even at the initial bids set by the Asset Purchase Agreement.

105.    Even under the most stringent standard for "money satisfaction" that requires full payment, these claimants are assured of full payment, and could be compelled to accept such payment in a legal or equitable proceeding.  The Assets may be sold free and clear of such liens under §363(f)(5).

106.    Under §363(f)(4), a debtor may sell assets free and clear of any interest subject to a bona fide dispute.  The Bankruptcy Code does not define the phrase "bona fide dispute." Nonetheless, courts applying §363(f)(4) have developed a standard for determining whether a "bona fide dispute" exists; that is, courts will inquire "whether there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest." In re Taylor, 198 B.R. 142, 162 (Bankr. D.S.C. 1996).

107.    Courts inquiring over the existence of a bona fide dispute "have held the parties to an evidentiary standard; evidence must be provided to show factual grounds that there is an 'objective basis' for the dispute." Id. (citing In re Collins, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995)).   There must be an "objective basis" either in law or fact to cast doubt on the legal rights of the lender factually or legally.   See Revel AC v. IDEA Boardwalk, LLC, 802 F.3d 558 (3d Cir. 2015).

108.    Some courts note that the evidentiary record required to support a finding of a "bona fide dispute" for purposes of §363(f)(4) depends upon a case-by-case consideration of the following: (i) the procedural posture of the case; (ii) the need to expedite the sale, and (iii) the

nature of the basis for determining that a dispute exists. <u>In re Robotic Vision Sys., Inc.</u>, 322 B.R. 502, 506 (Bankr. D.N.H. 2005).

109.    "At a minimum, a party must articulate in a pleading or in an argument an objective basis sufficient under the facts and circumstances of the case for the court to determine that a bona fide dispute exists." <u>See</u> <u>Milford Group, Inc. v. Concrete Step Units, Inc. (In re Milford Group, Inc.)</u>, 150 B.R. 904, 906-07 (Bankr. M.D. Pa. 1992) (holding that the testimony of the debtor as to the existence of a "bona fide dispute" was sufficient to allow the court to make a finding of the existence of such a dispute for purposes of §363(f)(4)).

110.    Importantly, this standard does not require the Court to resolve the underlying dispute or determine the probable outcome of the dispute prior to authorizing a sale pursuant to §363(f)(4), but merely whether such a dispute exists.  The moving party bears the burden of showing that a bona fide dispute exists for purposes of Section 363(f)(4) of the Bankruptcy Code. <u>See</u> <u>In re Gulf States Steel, Inc.</u>, 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002).

111.    As discussed extensively in the Complaint and the Motion to Limit Credit Bidding, secured lender Sharestates repeatedly breached its lending contracts with each of the debtor by refusing to disburse money timely and in the necessary amounts, using cross-default provisions to extract concessions from debtor not in default, and otherwise charging fees and amounts not permitted in the contracts to enrich itself and its affiliates.

112.    As such, a bona fide dispute exists as to the validity and amount of all purported mortgage liens on all Assets.  The Assets may be sold free and clear of all such mortgages.

113.    Holders of liens, claims, or interests in or against the Assets will be adequately protected because their liens, claims, and/or interests will attach to the proceeds of the sale with the same force, effect, and priority as their prior liens, claims and/or interest in the Assets,

subject to any defenses the debtor may possess with respect thereto. Accordingly, Sale of the Assets free and clear of all adverse interests are warranted, and the Sales should be approved under §363(f) of the Bankruptcy Code.

### E.   The Assumption and Assignment of Assumed Contracts Should be Authorized, and the Assumption and Assignment Procedures Provide Adequate Notice and Opportunity to Object and Should Therefore be Approved.

114.   Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a); see also University Medical Center v. Sullivan (In re: University Medical Center), 973 F.2d 1065, 1075 (3d Cir. 1992). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); In re Bildisco, 682 F.2d 72, 79 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984); In re Federated Dep't. Stores, Inc., 131 B.R. 808, 811 (S.D. Ohio 1991). See, e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).

115.   This standard is satisfied when a debtor determines that assumption will benefit the estate. See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993). Moreover, the standard requires that the court approve the debtor's business decision unless it is the product of bad faith, whim, or caprice. See In re Trans World Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001).

116.   If the debtor has reasonably exercised its business judgment, a court should approve the assumption or rejection of an unexpired lease or executory contract. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Group of Institutional Investors v. Chicago M St.

P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Dist., 872 F.2d at 39-40; In re Bradlees Stores, Inc., 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) (upon finding that the debtor has exercised its sound business judgment in determining that assumption of the lease is in the best interest of the debtor, its creditors, and other parties in interest, the court should approve assumption of the lease under §365(a) of the Bankruptcy Code).

117.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Stable Mews Assoc., 41 B.R. at 596. Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control over the administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).

118.    Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1). Whether a cure is "prompt" for purposes of § 365(b) depends on the facts and circumstances of each case.  See In re Mako, Inc., 102 B.R. 818, 821 (Bankr. E.D.Okla. 1988); In re Gold Standard at Penn, Inc., 75 B.R. 669, 673 (Bankr. E.D.Pa. 1987); In re Lawrence, 11 B.R. 44, 45 (Bankr. N.D.Ga. 1981); see also In re Whitsett, 163 B.R. 752, 754 (Bankr. E.D.Pa. 1994) (depending on the circumstances, a period of time in excess of a year could constitute prompt payment).  "Adequate assurance of prompt cure requires that there be a firm commitment to make all payments and at least a reasonably demonstrable capability to do so." In re R.H. Neil, Inc., 58 B.R. 969, 971 (Bankr. S.D.N.Y. 1986).

119.    Here, the Debtor has provided for a prompt cure.  To the extent the Cure Amount for any Assumed Contract has been established by final order prior to the Closing Date, such amount shall be paid by the Debtor to the counterparty to such Assumed Contract on the Closing Date.

120.    In addition, to the extent the Cure Amount for any Assumed Contract has not been established by final order prior to the Closing Date, the Debtor shall pay the Disputed Cure Amount to the Escrow Agent on the Closing Date, who shall hold the Disputed Cure Amount in accordance with the terms of a Cure Escrow Agreement, and who shall hold and distribute the Disputed Cure Amount and interest and gains thereon in accordance with the terms of the Cure Escrow Agreement.

121.    There are no known executory contracts that the Debtor or any purchaser would wish to assume.

122.    In short, it is unlikely that there will be any material cure issues regarding Assumed Contracts.

123.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. See In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of §365(f) is to assist the trustee in realizing the full value of the debtor's assets).

124.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract...and adequate assurance of future performance is provided." 11 U.S.C. §365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case but should be given

35

"practical, pragmatic construction." <u>See</u> <u>In re Sapolin Paints, Inc.</u>, 5 B.R. 412, 420-21 (Bankr. E.D.N.Y.1980). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>Accord</u> <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

125.    Additionally, as set forth above, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11, *provided* that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its §105(a) power is proper. <u>See</u> <u>Pincus v. Graduate Loan Ctr. (In re Pincus)</u>, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Accordingly, pursuant to §105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. <u>See, e.g.</u>, <u>In re Chinichian</u>, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); <u>In re Cooper Props, Liquidating Trust, Inc.</u>, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

126.    The Debtor respectfully submits that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed Contracts with adequate notice, in the form of the Cure Notice, of the proposed assumption and/or assignment of their respective contract, as well as proposed Cure Amounts, if applicable.

Such non-Debtor parties to the Assumed Contracts will then be given an opportunity to object to such notice. The Assumption and Assignment Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues).

127.     The Cure Notice and associated Assumption and Assignment Procedures are necessary to assure the Debtor's executory contractual counterparties that their interests will not be unduly harmed by this proceeding, thereby preserving value for the estate. Accordingly, the Debtor submits that implementation of the proposed Assumption and Assignment Procedures is appropriate in this case.

## F.     Relief from the Fourteen (14) Day Waiting Periods Under Bankruptcy Rule 6004(h).

128.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order unless the court orders otherwise." The Debtor hereby requests that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) is waived.

129.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6064.09 (Lawrence P. King, 15th ed. rev.). Furthermore, Collier provides that if an objection is filed and overruled, and the

objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such an appeal. Id.

130.    A prompt closing of the Sale is of critical importance to the continued preservation of value for the estate.  As discussed above, the Debtor has limited access to credit, and the Assets may lose value if they remain in their current incomplete state. Based upon the Debtor's experience in real estate development, they believe with good cause that consummating a sale transaction as soon as practicable is necessary to maintain value. Accordingly, the Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

### G.    No Successor Liability for the Successful Bidder.

131.    The Debtor requests that the Court enter an order authorizing the Assets to be sold free and clear of all liens, claims, interests, and encumbrances pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code. In addition, the Debtor submits that the Assets may be sold free and clear of claims, including successor liability claims, if any, as no Successful Bidder will, as a result of any action taken in connection with the purchase of the Assets: (a) be a successor to the Debtor; (b) have, *de facto* or otherwise, merged with or into the Debtor; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. On the contrary, the Debtor has filed this Motion for the purpose of selling all or substantially all of the Assets to an outside buyer prior to a potential liquidation of remaining Excluded Assets and the wind-up of any remaining operations.

132.    It is the intention of the Debtor that they will cease to exist following the conclusion of these chapter 11 proceedings and that the Assets will be acquired and operated or used as part of the business activities of an independent Successful Bidder. Moreover, the ability to acquire the Assets free and clear of any successor liability claims is a critical component of the

38

bargain reflected in the Asset Purchase Agreement; it will bring stability and finality to the purchase of Assets via the Sales, and thus enhances the ultimate value of the Assets to the Successful Bidder, and, by extension, to the estate.

**H.     The Proposed Sale Does Not Constitute a Fraudulent Transfer**

133.    The Debtor requests a finding in the Sale Order that the Asset Purchase Agreement (or any alternative agreement between the Debtor and a Successful Bidder) were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code and the laws of the United States, and that no Debtor or Successful Bidder is entering into a Sale transaction fraudulently.  As set forth herein, the Debtor has structured the Bid Procedures and Sale process to ensure that the resulting Sale will be an arm's length transaction yielding the highest and best value for the Assets.

134.    In addition, the Debtor and advisors have undertaken a comprehensive review of the market, including the employment of Keen, to identify all potentially interested buyers so as to ensure the maximum number of participants in the Auction. There are no contemplated bids by any insiders of the Debtor. Accordingly, the Debtor submits that good cause exists for a finding that the proposed Sale does not constitute a fraudulent transfer.

**I.     The Successful Bid is Fair Consideration for the Acquired Assets and Receipt of the Assumed Contracts.**

135.    The Debtor requests a finding in the Sale Order that the consideration provided by the Successful Bidder to the Debtor for the purchase of the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act and Uniform Voidable Transfer Act.

136.    As set forth herein, the Debtor has structured the Bid Procedures and Sale process to ensure that the resulting Sales will be an arms-length transaction yielding the highest and best

value for the Assets. The eventual sale price for the Assets will have been thrice subjected to a market check: first by way of the Debtor's efforts, which resulted in the identification of the Purchaser and the negotiation of the Purchaser's bid, second through Keen's marketing of the Assets and its efforts to identify potential bidders and third, through the open and competitive Auction process. The Debtor submits that these steps will ensure that the price paid by the eventual Successful Bidder will constitute the highest and best value for the Assets, and thus fair consideration.

137.    In addition, a finding that the purchase price constitutes fair consideration is an essential part of the bargain reflected in the Asset Purchase Agreement. It will bring stability and finality to the purchase of the Assets via the Sales, and thus enhance the ultimate value of the Assets to the Successful Bidder, and, by extension, to the Debtor's estate. For these reasons, the Debtor submits that good cause exists for a finding that the consideration provided by the Successful Bidder to the Debtor for its purchase of the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

**J.    Any Actions Against the Successful Bidder Arising Out of the Sale Should be Enjoined.**

138.    The Debtor requests that, as part of the Sale Order, the Court order that all persons and entities be forever barred and permanently enjoined from taking any actions against the ultimate Successful Bidder or their affiliates (as they existed immediately prior to closing) to recover any claim which such person has against the Debtor. Notwithstanding the foregoing, the Debtor does not seek any order (1) preventing such persons or entities from pursuing an action against the Successful Bidder under the terms of any applicable agreement or related documents for the purchase of the Assets; or (2) barring any administrative agencies, governmental, tax,

OMC\4833-5496-2424.v1-9/1/21

regulatory authorities, secretaries of state, and federal, state and local officials from properly exercising their police and regulatory powers.

139.    The foregoing injunction provisions are an integral part of the bargain reflected in the Asset Purchase Agreement.  In the interests of bringing greater stability and finality to the transfer of the Assets pursuant to the Sale, the Debtor submits that entry of an order in the form described above is justified in the interest of maximizing the value of the Assets to the estate.

## V.    <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that this Court enter orders granting the

relief requested herein and that it grant the Debtor such other and further relief as is just and

proper.

Respectfully submitted,

Dated:  September 1, 2021

**OBERMAYER REBMANN MAXWELL
& HIPPEL LLP**

By:    */s/ Edmond M. George*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Telephone: (215) 665-3140
Facsimile: (215) 665-3165
*Proposed Counsel to the Debtors*

OMC\4833-5496-2424.v1-9/1/21