# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **1121 PIER VILLAGE LLC, et al.** | : | **Bankruptcy No. 21-11466 (ELF)** |
|  | : | **(Jointly Administered)** |
| **Debtors.** | : |  |
|  | : |  |

## DEBTORS' MOTION FOR THE ENTRY OF AN ORDER GRANTING (A) AUTHORITY TO OBTAIN POST-PETITION FINANCING, (B) GRANTING LENDER LIENS AND SUPER PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 364(c)(1), (2) AND (3) AND 364(d), (C) RELIEF FROM THE AUTOMATIC STAY (D) AUTHORITY TO ENTER INTO AGREEMENTS WITH LENDER AND (E) RELATED RELIEF

Philadelphia-located debtors 1121 Pier Village LLC, Penn Treaty Homes LLC and 2626 Frankford LLC (collectively the "Debtors"), by and through their counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby move (the "Motion") for the entry of an Order (a "DIP Order") granting (a) the Debtors authority to obtain post-petition financing on the terms described herein, (b) granting the post-petition lender liens and super-priority administrative expense status pursuant to 11 U.S.C. §§ 364(c)(1), (2) and (3) and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), (c) granting relief from the automatic stay pursuant to section 362 of the Bankruptcy Code and (d) authorizing the Debtors to enter into agreements with an entity associated with 724 Group Investments, LLC and DIO Industrials LLC (the "Lender"), and, in support thereof, respectfully represent as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(a), (b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the requested relief are 11 U.S.C. §§ 105(a), 362, 363(b), 364, and Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 9014.

3.      The Debtors consent to the entry of a final order or judgment by the court if it is determined that the court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## II. BACKGROUND

### A. The Debtors' Projects and Encumbrances

4.      On May 23, 2021 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

5.      Additional debtors 193 Hancock LLC, 231 E 123 LLC and 285 Kingsland LLC, located in New York, also filed petitions on the same date. The cases of these debtors and the Debtors are jointly administered.

2.      No request has been made for the appointment of a trustee or examiner in the Debtors' Chapter 11 Cases.

3.      The United States Trustee has not appointed an Official Committee of Unsecured Creditors in any of the Debtors' bankruptcy proceedings.

4.      The Debtors own real estate development projects in varying stages of development ranging from raw land to partially-completed projects (the "Projects").

5.      The Project owned by Debtor 1121 Pier Village LLC is currently raw land. The Debtor contemplated building a 57-unit high end complex.

6.      It is purportedly encumbered by unit-by-unit mortgages on the nonexistent units in the total amount of $21,167,650.70, owed to the Debtors' prepetition lender Sharestates Intercap Line LLC and/or affiliated entities ("Sharestates").  See POC 10-1.

7.      This project is also purportedly encumbered by a mortgage on twenty (20) specific, unbuild units owed to seller-financier Henry J. Stewart Trust, in the claimed amount of $7,843,500.00.  See POC 5-2.

8.      This project is also purportedly encumbered by a mechanic's lien in the claimed amount of $526,549.10 owed to engineering contractor Urban Engineers Inc.  See POC 6-1.

9.      This project is also purportedly encumbered by a mechanic's lien in the claimed amount of $275,443.77 owed to design contractor Abitare Design Studio LLC.  See POC 7-1.

10.      This project is also encumbered by statutory liens owed to the City of Philadelphia for water and real estate taxes in the amounts of $18,464.92 and $81,974.63 respectively.  See POC 1-1, 3-1.

11.      The Project owned by Debtor 2626 Frankford LLC is a parcel of land that is ready for vertical construction.

12.      This project is purportedly encumbered by a mortgage in a claimed amount of $2,337,934.16 owed to Sharestates.  See POC 4-1.

13.      This project is also encumbered by statutory liens owed to the City of Philadelphia for water and real estate taxes in the amounts of $709.90 and $29,358.26 respectively.  See POC 1-1, 2-1.

14.      The Project owned by Debtor Penn Treaty Homes LLC (the "Penn Treaty Project") currently consists of a non-watertight vertical shell for 18 contemplated units.

OMC\4818-8781-3625.v1-9/1/21

15.     This project is purportedly encumbered by unit mortgages in a total claimed amount of  $32,108,647.73 owed to Sharestates.  See POC 6-1.

16.     This project is also encumbered by a mechanics lien owed to Beacon Sales Acquisition Inc. in the amount $74,489.41.  See POC 1-2.

17.     This project is also encumbered by statutory liens owed to the City of Philadelphia for water and real estate taxes in the amounts of $831.48 and $78,504.71 respectively.  See POC 3-1, 5-1.

18.     Due to Sharestates's intentional misadministration of the lending relationship, The Penn Trearty Project was left in a condition which did not protect it from the elements.  No work has been performed on the Penn Treaty Project in over a year.

19.     As a result of this weathering, the vertical construction on the Penn Treaty Project is no longer work remediating.  Instead, in the exercise of their business judgment, the Debtors will demolish the Penn Treaty Project in order to prepare it for sale, to be authorized by a contemporaneous motion.

20.     The Debtors also have other valuable assets which are not encumbered by any existing lien: causes of action and rights under the Bankruptcy Code.

21.     The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the May 27, 2021 complaint commencing 1121 Pier Village LLC et al. v. Sharestates Intercap Line LLC et al., Adversary No. 21-44-elf (the "Complaint"), incorporated herein as if set forth at length.

22.     As described more extensively in the Complaint, Sharestates served as secured construction lender for all Debtors' real estate development projects.

4

23.     The loans to each Debtor were cross-defaulted, meaning a default by any Debtor would allow Sharestates to accelerate the loans and begin foreclosure against all other Debtors.

24.     Over the course of their lender-borrower relationship, Sharestates committed acts of lender liability, including, upon information and belief, fraudulently representing that funds would be available timely for construction draws when Sharestates did not have those funds available, unilaterally changing the contractual draw process in breach of its duties and threatening to foreclose on Debtors that were not in default of contractual payments in order to extract concessions on larger Debtors.

25.     The misconduct described in the Complaint caused the failure of all Debtors' development projects and necessitated the instant bankruptcy filings.

26.     The Debtors filed the Complaint to recover affirmative damages for Sharestates's misconduct, putting the validity and amount of the Sharestates into serious doubt.

27.     Additionally, the Debtors seek to avoid the unit-by-unit mortgages on the Project owned by 1121 Pier Village LLC, because they are unperfected as against unbuilt units.

28.     The 20-unit mortgage recorded by Sharestates is similarly avoidable in an adversary proceeding.

## B.  **The Debtors' Financing Needs**

29.      The Debtors, in the normal course of business, must maintain insurance on all Projects and keep up with real estate taxes.

30.     Given the extent of existing obligations to their secured creditors, the Debtors have determined that they cannot successfully reorganize by restructuring their debt and paying upon a reorganization plan out of go-forward revenue.

OMC\4818-8781-3625.v1-9/1/21

31.     Instead, in the exercise of their business judgment, the Debtors have elected to market and sell the Projects.  By a separate motion (the "Sale Motion"), the Debtors will seek Court authorization to do so.

32.     In order to maximize the value of those sales, the Debtors wish to demolish vertical construction on the Penn Treaty Project.

33.     This demolition will make the Penn Treaty Project more marketable, as potential buyers will not be bound to complete the contemplated 18 units but will instead be able to propose any appropriate project that maximizes their return.

34.     The vertical construction on the Penn Treaty Project is not salvageable in any event, so any potential buyer would be required to tear it down.  The Debtors can increase the sale value by performing that demolition prior to closing on a sale, allowing a buyer to obtain a shovel-ready Project.

35.     These demolition efforts efforts will both increase the value of these Projects and make them marketable to a wider group of potential investors.

36.     The Debtors believe, based on their expertise in developing residential real estate and estimates from their contractors, that this demolition can be completed for amounts consistent with the Approved Budget (as defined below).  See Ex. B.

37.     The Debtors have elected, in the exercise of their business judgment, to use their prepetition general contractor CTI Construction ("CTI") to complete remaining work.

38.     CTI offered the lowest bid for demolition, and is also familiar with the existing construction.  By using a general contractor familiar with existing work they themselves performed, the Debtors will be able to start and complete demoliution on the schedule contemplated in this Motion.

39.    The Debtors also wish to undertake a substantial marketing efforts to ensure that they obtain the highest and best prices for the Projects.

40.    At present, the Debtors have a shortage of available cash to operate their business and undertake these construction and marketing efforts.

41.    In order to continue operations and maximize sale value, the Debtors require post-petition financing.  After discussions with several potential lenders, the Lender has agreed to fund a debtor-in-possession loan to the Debtors in connection with the Debtors' efforts to finalize construction, rent units to tenants and conduct a nationwide marketing effort for the sales.

42.    Lender has agreed to provide a secured loan of up to $800,000.00 (the "Loan") to, among other things, (a) provide working capital and fund operations post-petition, as well as the payment of certain administrative expenses; and (b) allow the Debtors to conduct a sale process.

43.    Absent the immediate availability of cash and post-petition financing, the Debtors would not have the funds with which to conduct business or complete necessary demolition to maximize the sale value of the Projects.

44.    The Debtors have negotiated a loan agreement (the "DIP Facility") pursuant to which Lender will extend Debtors the Loan.  A true and correct copy of the executed term sheet (the "Term Sheet") laying out the material terms of the DIP Facility is attached as **Exhibit "A"** and incorporated herein.  The Debtors request authority to enter into the DIP Facility and related documents (the "Financial Agreements").

45.    The Debtors and the Lender request authority to borrow and advance on prepetition and post-petition assets and for Lender to have a first priority lien on all of Debtors'

assets (the "Assets"), superior to any existing properly perfected and unavoidable liens existing as of the Petition Date, as well as superpriority administrative claims.

46.    The Debtors and Lender further request that the liens of the all current lienholders must be subordinated to the Lender's new loan.

47.    The Lender has indicated its willingness to extend post-petition financing to the Debtors in accordance with and on the terms set forth in the DIP Facility, the principal terms of which are summarized as follows (which summary is qualified in all respects by the Term Sheet):

Borrower: 1121 Pier Village LLC, Penn Treaty Homes LLC and 2626 Frankford LLC

DIP Facility Amount: Up to the amount of $800,000.00, subject to the entry of an Order approving the Debtors' proposed post-petition financing.

Interest Rate: 9.9% fixed rate per annum, paid in kind and added to principal monthly, increasing automatically to 11.9% per annum upon occurrence and continuation of an Event of Default (defined below). All accrued and unpaid interest shall be payable by Borrower to the DIP Lender on the Termination Date. All computations of interest payable hereunder shall be on the basis of a three hundred sixty (360)-day year consisting of twelve (12) thirty (30)-day months and actual days elapsed in the period of which such interest is payable. .

Availability/Use of Proceeds: To extend to the Borrowers, during the pendency of the Cases, credit in the amount of $800,000.00, plus any default margin or costs, of which up to $700,000 may be drawn in cash draws for expenditures consistent with the Approved Budget (defined below). Proceeds of the DIP Facility shall be available to (1) fund working capital requirements, operating expenses, capital expenditures, administrative expenses of the Cases and other line items of the Borrowers, including but not limited to demolition and permitted pre-petition payments, all in accordance with a 13-week budget, and any continuation budgets, to be prepared and updated weekly by Borrowers and approved by Lender (the "Approved Budget"); (2) fund the payment of interest accrued on the DIP Facility; and (3) pay the fees and expenses of Lender related to the DIP Facility and the Cases, including, without limitation, diligence fees and costs, and fees of attorneys and other professional advisors..

Security/Priority: Pursuant to Sections 364(c)(1),(2) and (c)(3) and 364(d) of the Bankruptcy Code, the Debtors' obligations are to be secured by a first priority

lien on and security interest in all of the Debtors' property and assets whether now owned or hereafter acquired, including causes of action arising under Chapter 5 of the Bankruptcy Code, subject to already existing and properly perfected and unavoidable liens existing as of the Petition Date, and all of the Lender's claims are to receive super-priority treatment.

Fees and Expenses: (i) Origination Fee of $30,000.00 paid in kind as a draw at origination; (ii) Origination Expenses (as defined in the Term Sheet) capped at $100,000 and paid in kind as a draw on the DIP Facility; and (iii) all costs and expenses of Lender incurred in connection with the enforcement, protection, defense or collection of the DIP Facility, any title insurance, recording fees, subsequent documentation relating to the DIP Facility, the security interests granted to Lender, and the indebtedness under the DIP Facility..

Termination:  The earliest of the following: (i) the date that is one hundred eighty (180) days after the closing date of the DIP Facility; (ii) the effective date of a Chapter 11 plan of Borrowers; (iii) the consummation of the sale of any real property asset or material personal property unless the Lender in its sole discretion waives the treatment of such event as maturing the loan; or (iv) the acceleration of the indebtedness under the DIP Facility, including, without limitation, as a result of the delivery of a notice of an Event of Default.

Milestones:
(i)     File motions to approve DIP Facility and to approve bid procedures: September 1, 2021
(ii)    Entry of a final order approving DIP Facility and orders approving bid procedures, which shall designate an entity associated with Lender as the stalking horse bidder for the assets of 1121 Pier Village LLC and Penn Treaty Homes LLC, and an entity associated with Lender as the stalking horse bidder for the assets of 2626 Frankford LLC (collectively the "Assets): September 27, 2021
(iii)   Competing bid deadline for the Assets: October 29, 2021
(iv)    Auction of the Assets: November 3, 2021
(v)     Hearing to approve sale of the Assets: November 5, 2021
(vi)    Entry of order approving the sale of the Assets: November 8, 2021
(vii)   Closing on the Assets: As soon as practicable after entry of the order approving sale, but no later than November 30, 2021

Conditions:
(viii)  Usual and customary for facilities of this nature, including, but not limited to those below;
(ix)    Execution of the Definitive DIP Documentation in form and substance satisfactory to Lender in its sole discretion;
(x)     Entry of the Interim Order or, if none, entry of the Final Order and such Final Order becoming final and non-appealable, in either case in form and substance satisfactory to Lender in its sole discretion;

      (xi)     Receipt by Lender of the Approved Budget, in form and substance satisfactory to Lender in its sole discretion;

      (xii)    Clean title searches as to all collateral;

      (xiii)   There shall have occurred no material adverse change.

48.     The Approved Budget for the Debtors is attached as **Exhibit B**.

## III.    RELIEF REQUESTED

**A.  This Court Should Grant the Debtors Authority to Obtain Post Petition Financing; Granting liens and a Super Priority Administrative Expense Status Pursuant to Sections 364(c)(1), (2) and (3) of the Bankruptcy Code; and Grant Relief From the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code**

49.     The statutory requirement for obtaining post-petition credit under section 364(c)(2) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under §503(b)(1) of the [Bankruptcy Code]." Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit under Section 364(a) of the Bankruptcy Code, or unsecured credit allowable as an ordinary administrative claim.  In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under §364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

50.     Courts have articulated a three-prong test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code, namely that (1) debtor is unable to obtain financing by other means i.e., by allowing a lender only an administrative claim (2) the financing is necessary to preserve the assets of the estate; and (3) the terms of the financing are fair, reasonable, and adequate, given the circumstances by the debtor-borrower and the proposed lender.

OMC\4818-8781-3625.v1-9/1/21

51.    Given the state of Debtors' assets and the existing liens liens held by Sharestates, which are highly contested by the Debtors, the Debtors have no prospect of obtaining financing solely on an unsecured, administrative-claim basis.  Under these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Bray v Shenandoah Federal Sav. and Loan Ass'n. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

52.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code.  Id; see also In re Plabell Rubber Prods. Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Where there are few lenders likely to be able and/or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct an exhaustive search for financing." In re Ski Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988)), aff'd sub nom, Anchor Sav. Bank TSB v. Sky Valley, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

53.    The terms of the Loan are fair and reasonable in light of the Debtors' credit history and as compared to the terms available on the market.  The Debtors have sought alternate funding on better terms but have been unsuccessful.

54.    In accordance with Section 364(c) of the Bankruptcy Code, the Debtors represent that they are unable to obtain credit for operations, construction or marketing on an (a) unsecured basis; (b) on the basis of a general administrative claim; or (c) on any basis more favorable to the Debtors than proposed in this Motion, and that after diligent efforts the Debtors are unable to obtain credit from any other source.

55.    The Debtors request that (i) Lender extend post-petition credit supported by by a super-priority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code and

(ii) liens, pursuant to Sections 364(d) of the Bankruptcy Code, to finance the Debtors' post-petition operations in accordance with the DIP Facility.

**B.** **This Court Should Grant the Debtors Authority to Obtain Post Petition Financing; Granting First-Priority Liens Pursuant to Sections 364(d) of the Bankruptcy Code; and Grant Relief From the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code**

56.     Purusant to 11 U.S.C. §364(d), the Court, "after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

57.     In order to obtain such a "priming lien," the moving party must show that existing liens which are to be primed are adequately protected.

58.     The DIP Facility requires that the Lender receive a first priority lien in the Assets of the Debtors, and in that regard, the Debtors request that the Order entered herein specifically provide that the existing liens be subordinated to the Lender's DIP Facility.

i.     Statutory Liens are Adequately Protected by Existing Equity.

59.     Adequate protection under section 361 is determined on a case-by-case basis depening upon the facts and circumstances of the case and the purposes for which adequate protection is sought.  As used in section 364, adequate protection "may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property. 11 U.S.C. § 361. The last possibility is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party. Therefore, a determination of whether there is adequate protection is made on a case by case basis." Resolution Tr. Corp. v. Swedeland Dev. Grp. (In

OMC\4818-8781-3625.v1-9/1/21

re Swedeland Dev. Grp.), 16 F.3d 552, 564 (3d Cir. 1994) citing In re O'Connor, 808 F.2d

1393, 1397 (10th Cir. 1987).

60.    "[I]f a debtor has equity in a property sufficient to shield the creditor from either

the declining value of the collateral or an increase in the claim from accrual of interest or

expenses, then the creditor is adequately protected." In re Colonial Center, Inc., 156 B.R. 452,

460 (Bankr. E.D. Pa. 1993)

61.    To calculate the value protecting a lien, the value of the collateral is measured

against the amount of the movant's secured claim plus any secured claims senior to the

movant's claim. In re Liona Corp., N.V., 68 B.R. 761, 767 (Bankr. E.D. Pa. 1987).

62.    Because they prime existing mortgage liens pursuant to statute, mechanic's liens

and tax liens ("Statutory Liens") are currently first in priority on all real property owned by the

Debtors.  Given the small amount of the filed Statutory Liens, as well as any other statutory

liens that the Debtors anticipate may be perfected under section 546(b) (together with the

Statutory Liens, the "Primed Statutory Liens"), in comparison to the value of the real property

they encumber, the Primed Statutory Liens will be adequately protected by value in the real

property even if they are subordinated to a lien in favor of Lender.

63.    To the extent these liens are to be subordinated, the Debtors aver that the real

property has substantial value well in excess of the amount of the Primed Statutory Liens,

which will permit the holders of Primed Statutory Liens to maintain the same equity in the

Debtors' Assets.  In other words, because the value of the Debtors' real property substantially

exceeds the amout of the DIP Facility plus the amount of the Statutory Liens, the Statutory

Liens are adequately protected. For the avoidance of doubt, nothing herein constitutes a

stipulation or admission by any Debtor as to the amount, extent, validity or perfection of any alleged Primed Statutory Lien.

> ii.  Sharestates and Stewart are Adequately Protected by Replacement Liens and Augmented Collateral

64.    To adequately protect Sharestates's and Stewart's alleged lien position on the Debors' assets, the Debtors may offer them replacement liens on additional collateral and any other offering that provides them with the indubitable equivalent of their interest.

65.    "In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard. This flexibility, however, must not operate to the detriment of the secured creditor's interest. In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence." In re Martin, 761 F.2d 472, 476-77 (8th Cir. 1985).

66.    This analysis was echoed in a DIP lending context in First Sec. Bank & Tr. Co. v. Vander Vegt, 511 B.R. 567, 581 (N.D. Iowa 2014).  In that case, the court upheld the bankruptcy court's finding that an undersecured prepetition creditor was adequately protected when the debtor sought DIP financing and a priming lien.  In making this finding, the bankruptcy court found that the loans fully covered the costs of contemplated construction and that the contemplated construction would increase the value of the real estate by at least as much as the costs of construction.  Id. at 581-85.  See also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 632 (Bankr. S.D.N.Y. 1992) ("In the instant case, [lender] will be adequately protected because the infusion of approximately $600,000.00 in improvements from the

borrowed proceeds will enhance the value of the property secured by [lender's] mortgage by at least the amount of the borrowed proceeds.").

67.    While greater scrutiny is applied to the adequate protection analysis when it is based on the value of contemplated improvements, the Third Circuit has clearly stated that improved value based on future construction can be a part of adequate protection when coupled with other, new forms of protection: "Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." Resolution Tr. Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.), 16 F.3d 552, 566 (3d Cir. 1994).

68.    Demolition has long been recognized as a value-increasing "improvement" when existing structures are a net liability.  Randolph Building Corp. v. Commissioner Of Internal Revenue, 67 TC 804, 807 (T.C. 1977) ("it is the building that is a liability and can be said to have declined in value; when the building is removed, the value of the property increases, again demonstrating that variations in the value of the property are attributable to changes in the status of the physical improvements.").

69.    Here, the Approved Budget allocates a substantial amount to value-improving demolition.  In fact the contemplated demolition would be necessary for any owner to prepare the Penn Treaty Project for construction.  Since each dollar of post-petition construction represents at least a dollar of necessary costs to any potential purchaser, each dollar of construction improves the value of the Penn Treaty Project at a sale by at least that amount.

70.    The contemplated demolition makes the Projects more appealing to buyers, who are much more likely to offer top dollar for a shovel-ready parcel than incomplete

construction: no purchaser wishes to buy in-progress construction if it can help it. Partially-complete but depreciating structures will be a drag on the marketable value.

71.    Pursuant to the suggestion of the Third Circuit in <u>Swedeland Dev. Grp.</u>, Sharestates's liens will not be protected merely by contemplated value-improving construction. The Debtors are offering two (2) additional forms of adequate protection, each of them solely to the extent of any actual diminution in the value of Sharestates's collateral.

72.    First, the Debtors will offer Sharestates and Stewart a replacement lien, junior to the DIP liens, in the amount of the DIP Facility in all assets of the Debtors. This replacement lien takes the form of one blanket lien against all three (3) Debtors, cross-collateralizing what had previously been individual loans collateralized only by the specific property of the borrower-Debtor.

73.    The material assets of the Debtors consist of the Projects, accounts receivable and Debtor causes of action, each of which provides protective value to Sharestates and Stewart via the replacement lien.

74.    Sharestates's and Stewart's liens are each secured only by one parcel of real property; the replacement lien will ensure that – to the extent of the Loan – a debt validly owed can be paid out of value on any of the Debtors' Projects once that value is realized.

75.    The Debtors each have affirmative claims for substantial damages arising from the misconduct of Sharestates and the other defendants alleged in the Complaint (the "Claims"). The Debtors' Claims pled in the Complaint sound in contract and tort. Even adjusted for appropriate litigation risk, the Claim are highly valuable and run into the millions of dollars. In fact, the Claims are of special interest to Sharestates, as Sharestates is the primary defendant to the Complaint. Granting Sharestates a lien on the Claims not only

provides valuable additional collateral, it also protects Sharestates: upon resolution of the Claims, Sharestates will be able to offset the unpaid amount of the replacement lien against its affirmative liability instead of producing cash to pay.

76.    The Debtors also have an avoidance cause of action against Stewart due to the unperfected state of its unit mortgages on nonexistent units.  Granting Sharestates and Stewart a replacement lien on this cause of action similarly increases their collateral pool and provides Stewart with the same unique protections against claims that may be levied against it.

77.    Debtors Penn Treaty Homes LLC and 1121 Pier Village LLC each own approximately $100,000.00 in finishes – cabinets and other materials – that represent new collateral for a replacement lien.  See Debtors' Schedules A/B.

78.    The Debtors have other assets of note: accounts receivable owed by affiliates in the amount of approximately $1,221,660.89 owed to 1121 Pier Village LLC, approximately $6,656,205.41 owed to Penn Treaty Homes LLC and approximately $2,416,961.24 owed to 2626 Frankford LLC.  See Debtors' Schedules A/B.  The replacement lien will add these receivables to the existing collateral package.

79.    Lastly, the Debtors can offer Sharestates and Stewart an additional form of relief that provides strong protection against an inevitable risk following the completion of a sale: waiver of the right to seek surcharge under 11 U.S.C. §506(c).

80.    Pursuant to 11 U.S.C. §506(c), a debtor-in-possession "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

81.    A surcharge claim takes the form of an "equitable lien" superior to the lien of the benfitted secured creditor, to prevent the secured creditor from obtaining a windfall when the bankruptcy process preserves, improves or liquidates the collateral without the necessity of costly foreclosure action by the secured creditor.  See Loudoun Leasing Development Co. v. Ford Motor Credit Co. (In re K & L Lakeland, Inc.), 128 F.3d 203 (4th Cir. 1997); In re TIC Memphis RI 13, LLC, 498 B.R. 831 (Bankr. W.D. Tenn. 2013).

82.    "[T]o recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors." In re C.S. Assocs., 29 F.3d 903, 906 (3d Cir. 1994).

83.    The Debtors have incurred, or will inevitably incur, large expense amounts that are reasonable and necessary to preserving, improving and disposing of the Projects, to the direct benefit of Sharestates and Stewart.

84.    First, counsel fees, real estate professional fees and closing costs necessary to maintain, augment or dispose of collateral may be surcharged.  Surcharge claims exist to incentivize third-party professionals to assist debtors to market and sell debtor assets.  Borrego Springs Bank, N.A. v. Skuna River Lumber, LLC, 381 B.R. 211, 216 (N.D. Miss. 2008) (Authorizing surcharge of marketing and sale expenses because "If such third-party actors cannot be paid, they will not provide services.").

85.    Debtors' proposed counsel Obermayer Rebmann Maxwell & Hippel LLP has incurred, postpetition surchargeable professional fees in excess of $30,000.00 through the date of the filing of this Motion.  These amounts are attributable to efforts to to negotiate the

present DIP Facility and attendant stalking horse sales that will allow the Debtors to dispose of the Projects.  In the end, the surchargeable amount of attorney fees will be substantially higher.

86.     As discussed extensively in the Sale Motions filed concurrently with this Motion, the stalking horse purchaser for Pier and Penn is entitled to a Break-Up Fee of $120,000.00 and Expense Reimbursement up to $150,000.00.

87.     The stalking horse purchaser for 2626 Frankford LLC is entitled to a Break-Up Fee of $4,000.00 and Expense Reimbursement up to $6,000.00.

88.     Keen Realty LLC will be employed by the Debtors via a forthcoming application to market and sell the Projects in a nationwide marketing process.  Such a professional marketing process is necessary to ensure the Debtors receive the highest and best value for the Projects.

89.     Keen will be entitled to a fee of 5% of the eventual purchase prices.  Based on the existing stalking horse bids of $12,000,000.00 and $400,000.00, Keen would be entitled to a professional fee of $620,000.00.  If, as expected, the marketing process produces overbids, Keen's professional fee amount will increase.

90.     Sharestates is purportedly undersecured.   As such, each additional dollar realized by Keen's marketing process and the stalking horse bid protections is an additional dollar of net benefit that will inure to Sharestates on account of its valid claims.

91.     Similarly, because Stewart holds a disputed mortgage against a sub-portion of a property, which sub-portion may not fully secure its claim, additional value generated by competitive bidding will inure to Stewart's benefit.

92.     The Debtors could therefor seek to surcharge the collateral in the amount of the Break-Up Fee, Expense Reimbursement and Obermayer's and Keen's professional costs. Waiver of the Debtors' right to do so is a substantial contribution to Sharestates and Stewart.

93.     Second, amounts expended to improve the real property postpetition may be surcharged.

94.     A substantial portion of the amounts in the Approved Budget is allocated to value-improving post-petition demolition.  Each such line item directly improves the collateral securing Sharestates's liens, and could be surcharged.

95.     Third, section 506(c) specifically provides that ad valorum property taxes may be surcharged.  11 U.S.C. §506(c).

96.     The Approved Budgets contemplate that the Debtors will pay approximately $24,000.00 in ad valorum property taxes prior to closing a sale.  These amounts will preserve Sharestates's lien position, providing them a direct benefit.

97.     The approximately $11,000.00 in property taxes paid on behalf of 1121 Pier Village LLC similarly benefits Stewart.

98.     In any event, a mortgage creditor is benefitted *per se* by the payment of such taxes, as the text of section 506(c) recognizes.  The Debtors would otherwise seek to surcharge the collateral for the amounts spent on taxes.

99.     In effect, surcharge provides a priming lien following disposition of collateral much as a DIP loan can be secured by an up-front priming lien.

100.    The pre-emptive waiver of surcharge claims against Sharestates and Steart provides two (2) forms of protection of their interests: value and certainty.

OMC\4818-8781-3625.v1-9/1/21

101.    The items the Debtors could seek to surcharge, discussed above, are not controversial: they provide clear and direct benefit to these secured creditors by augmenting or preserving their collateral package, then dispose of the collateral at the highest price the market will bear, without forcing the creditors to expend a single cent.  To the extent that these creditors have a valid secured claim, that valid claim will attach to the preserved and augmented proceeds generated by a sale.

102.    At that point, the Debtors would bring a surcharge proceeding to obtain an equitable lien in the amout of the expenses above.  In conformity with the policies embodied in section 506(c), Sharestates and Stewart would not be entitled to receive a windfall based on expenses incurred by the Debtors and paid for out of the Loan.

103.    Given the potential for legal expenses and Keen's commission to grow far larger than the amounts discussed above, these creditors cannot even be certain of the total amount it might be surcharged.

104.    In a surcharge proceeding, Sharestates and Stewart would also likely contest some or all of the expenses, and would incur extensive attorney costs and fees in doing so.

105.    Waiver of surcharge claims by the Debtors thus provides Sharestates and Stewart with hundreds of thousands of dollars of value representing the amounts waived, and absolute certainty that those amounts cannot expand as the case progresses.  It also prevents Sharestates and Stewart from being forced to litigate a surcharge action.

106.    Taken together, the replacement lien on all Assets, the actual improvement in the collateral value funded by the DIP Facility and the waiver of surcharge claims constitute adequate protection of Sharestates's and Stewart's interest in the amount of the Loan.

107.    Additionally, under the Approved Budgets, the Loan balance will be disbursed as expenses come due.  That is, the Lender will disburse a portion of the Loan proceeds which will fund demolition.  Before another disbursement is made, that demolition will actually occur, increasing the collateral value by the amount expended or more.  The amounts disbursed on the Loan will only "run ahead" of value improving demolition by a small amount, and that amount remains adequately protected by new cross-collateralization, liens on Claims and surcharge waiver.

108.    The granting of the super-priority administrative claims, security interests, and liens to Lender will enable Lender to provide post-petition financing to the Debtors through the DIP Facility, and in turn, permit the Debtors to continue contruction and proceed with their sale efforts.

109.    The Debtors believe that the request to obtain post-petition credit secured by a priming lien on all of the Debtors' Assets that is first in priority as to all other creditors, and payable as a superpriority administrative expense,, is proper, reasonable and necessary to continue the Debtors' operations through the date of the proposed sales.

110.    Approval of the Debtors' request to obtain post-petition credit from Lender secured by the requested liens in the Debtors' Assets, is in the best interest of the Debtors and creditors of the estate.

111.    The terms and provisions of the Loan described herein, including the DIP Facility and the provisions of the proposed Order, are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. Consequently, the Debtors request that the Court find that any loans or advances made by Lender pursuant to the Financial Agreement are made in good faith for the purposes of Section 364(e) of the Bankruptcy Code.

112.    As set forth above, the Loan is necessary to continue the Debtors' operations and allow the Debtors to continue on to the sale of its assets. Without approval of the Loan, the Debtors would be unable to obtain sufficient funds to ensure the viability of their businesses through sale.

113.    The Loan is sufficient to allow the Debtors to continue operations, jumpstart its stalled operations and proceed to a sale of its assets.  Without the Loan, the Debtors' efforts would be hampered and the value of the assets diminished.

114.    The Debtors have negotiated the terms of the Loan with Lender at arm's length and in good faith (as that term is defined in Section 364(e) of the Bankruptcy Code), with all parties represented by experienced counsel.  Such negotiations were extensive and time-consuming and involved a lively "give and take" between the Debtors and the Lender.

115.    As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors' management has concluded that the Loan is the only viable alternative available in the circumstances of this case.  Bankruptcy courts routinely defer to a debtor's business judgment on most businesses decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. R y., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D.Colo.1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

116.    The Debtors have exercised sound business judgment in determining that the Loan is appropriate and has satisfied the legal prerequisites to borrow.  The terms of the Loan are fair and reasonable and are in the best interests of the Debtors' estates.

**C.** **The Court Should Grant the Debtors Authority to Use the Loan Proceeds and Relief from the Automatic Stay**

117.    Pursuant to 11 U.S.C. §363(b), the Court may authorize the Debtors to use estate property outside the ordinary course of business.

118.    The amounts in the Approved Budgets generally represent ordinary-course expenses of the Debtors in developing residential real estate.

119.    In an abundance of caution the Debtors seek Court authorization to use the Loan proceeds for the postpetition expenses under section 363(b) to the extent they are not ordinary course expenses.

120.    As set forth more fully in the proposed Order, the proposed Loan contemplates a modification of the automatic stay established pursuant to Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to implement the terms and conditions of the DIP Facility and the provisions of the Order and to allow the Lender to exercise any and all of its rights and remedies under the Order and the Loan, in the event of Default or otherwise.

121.    The Court accordingly should modify the automatic stay to the extent contemplated by the Loan and the DIP Order.

122.    The Debtors request that the Lender's liens and security interests pursuant to Sections 364(c)(1)-(3), (d) of the Bankruptcy Code to secure repayment of all loans and advances shall attach to and be perfected against all of the Debtors' Assets upon the entry of an Order approving this Motion.

123.    The Debtors request that no additional financing statements or mortgages shall be required to be filed to perfect the post-petition super-priority administrative claim, liens, and security interests granted to Lender under this Motion.  However, should Lender elect to file or record financing statements, financing agreements, or other documents, the Debtors request Court permission to do so and also request modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code to allow for the recording of the same.

[REMINDER OF PAGE INTENTIONALLY LEFT BLANK]

OMC\4818-8781-3625.v1-9/1/21

WHEREFORE, the Debtors request that this Court enter an Order in the form attached hereto (i) approving the proposed secured and super-priority post-petition financing and (ii) granting such other and further relief as this Court deems just.

Respectfully submitted,


Dated: September 1, 2021

By: */s/ Edmond M. George*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Telephone: (215) 665-3140
*Proposed Counsel to the Debtors*

OMC\4818-8781-3625.v1-9/1/21