## UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | **Chapter 11** |
| **1121 PIER VILLAGE LLC, et al.** | **Case No. 21-11466 (ELF)** |
| Debtors. | **JOINTLY ADMINISTERED** |

# O P I N I O N

## I.  INTRODUCTION

On May 23, 2021, six (6) affiliated Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in this court:

> 285 Kingsland LLC ("Kingsland") (Bky. No. 21-11470)
>
> 193 Hancock LLC ("Hancock") (Bky. No. 21-11468)
>
> 231 E. 123 LLC ("231 E. 123") (Bky. No. 21-11469)
>
> 1121 Pier Village LLC ("Pier Village") (Bky. No. 21-11466)
>
> Penn Treaty Homes LLC ("Penn Treaty") (Bky. No. 21-11471)
>
> 2626 Frankford LLC ("Frankford") (Bky. No. 21-11467)

All six (6) Debtors are single asset real estate ("SARE") debtors i.e., entities whose primary activity is the business of owning single asset real estate as that term is defined in 11 U.S.C. §101(51B).

The Kingsland and Hancock properties are located in Brooklyn, NY and the 231 E. 123 property is located in Manhattan, NY (collectively, "NY Debtors" and "NY Properties").  The Pier Village, Penn Treaty and Frankford properties are located in Philadelphia, PA (collectively, "PA Debtors" and "PA Properties").[1]

---

[1]     When referring collectively to the real property of all of the Debtors, I will use the term "the Properties."

This court is jointly administering all six (6) Debtors' cases.

The Debtors filed their bankruptcy cases after disputes arose between them and their construction lenders, Sharestates Investments LLC and Sharestates Intercap Line LLC (collectively, "Sharestates"), as a result of which Sharestates ceased providing funds for ongoing construction. At the time of the filings, the Debtors' projects were at various stages of completion.

Presently before the court is Sharestates' motion to dismiss or convert the cases ("the Motion to Dismiss/Convert"). This court held a hearing on the Motion to Dismiss/Convert on December 20, 2021.

For the reasons stated below, I will grant the Motion to Dismiss/Convert.

As for the disposition of the cases, I conclude that the best course is to evaluate each Debtor individually. I will dismiss the cases of the NY Debtors and Frankford and I will convert the Pier Village and Penn Treaty cases to chapter 7.

## II.  The Debtors

The Debtors' respective asset and debt structures are substantially similar. But, there are some material differences as well.

As explained below, the real properties owned by each of the Debtors are overencumbered. Most, but not all, of the Debtors have a minimal amount of unsecured debt.

I begin with the NY Debtors.

### **Kingsland**

Kingsland is a partially completed real estate project. It is presently approximately fifty percent (50%) complete. Once completed, it would support three (3) to five (5) residential units.

In its bankruptcy schedules, Kingsland listed the value of the property as $529,000.00.[2]

However, the Debtor's principal, Alex Halimi, testified that its value is presently $2,000,000.00.[3]

In Schedule A/B, Kingsland listed accounts receivable totaling more than $640,000.00.

However, at the hearing on the Motion to Dismiss/Convert, Kingsland's  accountant, Stephen

Scherf, testified that the accounts receivable all arose from intercompany loans among various

debtor and non-debtor affiliates and, despite the contrary representation in the bankruptcy

schedules, most likely are not collectible.[4]

Sharestates filed a secured proof of claim of $2.9 million.  In Schedule D, the Debtor

scheduled a statutory lien in favor of the NYC Department of Finance ("NYC Finance") in an

unknown amount (presumably, for unpaid real estate taxes).  NYC Finance did not file a proof of

claim.

In  Schedule  E/F,  Kingsland  listed  various  unsecured  claims  held  by  insiders  (either

---

[2]    In this Memorandum, I use round numbers — not the exact amounts of the property values or claims.
The differences are immaterial.

At the December 20 hearing on the Motion to Dismiss/Convert, the Debtors' accountant, Stephen
Scherf, stated that all of the Debtors listed the value of their real estate at "book value," the value listed in the
tax records.  He explained that these values were used where the Debtors did not have current appraisals of
their properties.

[3]    Mr. Halimi testified regarding valuation at a hearing on November 4, 2021.  Mr. Halimi also opined
that each of the Debtors' respective properties would have a much higher value once completed.  Of course,
completion of the projects would require the expenditure of additional borrowed funds.  In any event, for
present purposes, I find no probative value in that aspect of his testimony.

[4]    The other Debtors similarly listed accounts receivable:

| | |
|---|---|
| Hancock: | more than $730,000.00 |
| 231 E. 123: | more than $800,000.00 |
| Frankford: | more than $2,400,000.00 |
| Pier Village: | more than $1,200,000.00 |
| Penn Treaty: | more than $6,500,000.00. |

The Debtors' accountant stated that it is likely that all of these accounts receivable are uncollectible.

principals of Kingsland or affiliates) in excess of $300,000.00.[5]  Two (2) other unsecured creditors

filed claims: Triborough Scaffolding & Hoisting, Inc. ("Triborough") ($40,900.00) and the New

York State Department of Taxation and Finance ("NYS Dep't of Taxation") ($1,400.00).

### Hancock

Hancock is a nearly completed real estate project.  It is a two-family residential property.

One (1) unit is occupied.

In its bankruptcy schedules, Hancock listed the value of its real property as $2,095,000.00.

The Hancock's principal testified that its value is presently $3,000,000.00.

Sharestates filed a secured claim of $3,400,000.00.  In Schedule D, Hancock scheduled a

statutory lien in favor of the NYC Finance in an unknown amount (again, presumably, for unpaid

real estate taxes).  NYC Finance did not file a proof of claim.

In Schedule E/F, Hancock listed various unsecured claims held by insiders (either

principals of Hancock or affiliates) in excess of $250,000.00.  Hancock listed several unsecured

creditors (including Triborough).  Some were listed with the debt amounts as "unknown."

Triborough was listed as holding a $2,000.00 claim and later filed a proof of claim for $1,900.

CTI Construction, Inc. ("CTI") was listed as holding a liquidated, noncontingent, undisputed

---

[5]      This total (as well as insider-claim totals for other Debtors listed below) does not include a peculiar
disclosure that four (4) of the six (6) Debtors made in Schedule E/F — the existence of debts to an "Unknown
Affiliate."  (How can an affiliate be unknown?).  This entity is located at the same mailing address for the
Debtor entities: 93-16 71[st] Drive, Forest Hills, NY 11375.  The amounts listed were:

| | |
|---|---|
| Kingsland: | $118,500.00 |
| Hancock: | $1,400,000.00 & $5,000.00 |
| 231 E. 123: | $1,810,000.00, $46,000.00 & $10,000.00 |
| Penn Treaty: | $7,000.00 |

These scheduled debts were not addressed at the hearing on the Motion to Dismiss/Convert.

claim of $24,000.00.[6]  According to the Claims Register, three (3) other entities filed general

unsecured claims: Consolidated Edison Company of New York, Inc. ("Con Edison") ($7,900.00),

U.S. Internal Revenue Service ("IRS") ($13,800.00), and NYS Dep't of Taxation ($1,900.00).

### 231 E. 123

231 E. 123 is another nearly completed project.  It is an apartment building with 11 units.

In the bankruptcy schedules, 231 E. 123 listed the value of its real property as

$2,063,000.00.  231 E. 123's  principal testified that its value is presently $5,500,000.00.

Sharestates filed secured claims of totaling $7,600,000.00.  In Schedule D, 231 E. 123

scheduled a statutory lien in favor of the NYC Finance in an unknown amount (again, presumably,

for unpaid real estate taxes).  NYC Finance did not file a proof of claim.

In Schedule E/F, 231 E. 123  listed various unsecured claims held by insiders (either

principals of t231 E. 123  or affiliates) in excess of $550,000.00.  231 E. 123  listed several

unsecured creditors (including Triborough), some with debt amounts "unknown."   Triborough

was scheduled as holding a $8,000.00 claim and later filed a proof of claim for the same amount.

According to the Claims Register, three (3) other general unsecured claims were filed: Con Edison

($8,600.00), the IRS ($23,000.00), and NYS Dep't of Taxation ($2,200.00).

### Frankford

Frankford is a planned unit development designed for twenty (20) units.  Frankford has

represented that it "is a parcel of land that is ready for vertical construction." (Debtors' Motion for

[Inter Alia] Authority to Obtain Postpetition Financing ¶ 11) (Doc. # 116).

In the bankruptcy schedules, Frankford listed the value of its real property as $127,000.00.

Frankford's principal testified that its value is presently $1,100,000.00.

---

[6]     CTI Construction did not file a proof of claim, but it nonetheless holds an allowed unsecured claim.
See Fed. R. Bankr. P. 3003(b)(1).

Sharestates filed a secured proof of claim in the amount of $2,300,000.00.  The City of Philadelphia ("City") filed two (2) secured claims totaling $30,000.00.

In Schedule E/F, Frankford listed insider claims in excess of $1,700,000.00.  Frankford listed only a single non-insider, non-contingent, undisputed liquidated claim: Bohler Engineering PA, LLC ("Bohler Engineering") ($7,000.00).  The IRS filed the only general unsecured proof of claim, in the amount of $7,000.00.

### Pier Village

Pier Village is a real estate project on the Delaware River waterfront in Philadelphia.  It consists of fifty-seven (57) separate lots on which Pier View intended to build a combination of townhouses and multi-family dwellings.  It is presently "raw land."

An unusual feature of this project is that, instead of a single credit facility for the financing, Pier Village entered into separate notes and mortgages, lot-by-lot.  The secured creditors are Sharestates and the Henry J. Stewart Trust ("Stewart Trust"), each holding a first mortgage position on different lots.

In the bankruptcy schedules, Pier Village listed the value of its real property as $2,900,000.00.  Pier Village's principal testified that its value is presently $12,000,000.00.

Sharestates filed a secured proof of claim of $21,100.00.00.

The Stewart Trust filed a secured proof of claim of $7,800,000.00.

The City filed two (2) secured proofs of claim totaling $100.000.00.  Three (3) creditors have filed proofs of claim based upon asserted mechanic's liens: Abitare Design ($275,000.00), CTI ($512,000.00), and Urban Engineers ($526,000.00).

In Schedule E/F, Pier Village listed various unsecured claims held by insiders (either principals of Pier Village or affiliates) in excess of $5,250,000.00.  Pier Village also listed the following liquidated, noncontingent, undisputed debts: Cider Mill Services, Inc. ($35,000.00) and

Klehr Harrison ($17,900.00). The City filed an unsecured priority claim of $123,000.00.
Unsecured proofs of claim were filed by: the IRS ($6,900.00), Bohler Engineering ($2,000.00),
and BM Consulting Services, Inc. ($35,900.00).

## Penn Treaty

Penn Treaty is another real estate project on the Delaware River waterfront in Philadelphia,
adjacent to the Pier Village property.

When the bankruptcy was filed, the construction of the intended seventeen (17) or eighteen
(18) town homes was partially completed. However, after the delays in completing the
construction process arising from the Penn Treaty's disputes with Sharestates, the construction
was compromised by the effects of weather (and possibly vandalism). Consequently, Penn Treaty
did not consider it possible to complete the construction. Rather, Penn Treaty sought postpetition
financing to demolish the existing structures in advance of a proposed sale of the real property.
(See Debtors' Motion for [Inter Alia] Authority to Obtain Postpetition Financing) (Doc. # 116)
("the PA Properties Finance Motion"). Before that motion could be determined, a fire broke out
on the property. As a result, with the authority granted by this court on August 20, 2021, (see
Doc. # 88), the City exercised its police power to protect the public health, welfare, and safety and
demolished the existing construction.

In the bankruptcy schedules, Penn Treaty listed the value of its real property as
$3,370,000.00. Penn Treaty's principal testified that its value is presently $8,000,000.00.

Sharestates filed a secured proof of claim of $32,100.000.00. The City filed a secured
proof of claim in the amount of $78,500.00 for unpaid real estate taxes. Beacon Sales Acquisition,
Inc. and CTI filed proofs of claim secured by mechanic's liens in the amounts of $74,000.00 and
$512,000.00, respectively. In Schedule D, Penn Treaty also listed two (2) additional claims

secured by mechanic's liens: Abitare Design ($13,000.00), and Zooguy Renovations, LLC ($262,000.00).

In Schedule E/F, Penn Treaty listed various unsecured claims held by insiders (either principals of Penn Treaty or affiliates) in excess of $1,800,000.00.  In the schedules, Penn Treaty listed what appear to be non-insider claims (as non-contingent, undisputed, and liquidated) that have not been superseded by filed proofs of claim totaling approximately $112,000.00.  The IRS filed an unsecured claim of $200.00.  HBK Engineering filed an unsecured claim of $15,600.00.

## III. PROCEDURAL HISTORY

To put the issues before the court in context, it is helpful to review the salient parts of the procedural history of these cases.

As stated earlier, the Debtors filed their six (6) bankruptcy petitions on May 23, 2021.  On July 2, 2021, I entered the order providing for joint administration.  The Debtors filed their respective bankruptcy schedules and statements of financial affairs on June 28, 2021.  On July 9, 2021, I entered an order setting a general deadline of August 18, 2021 for filing proofs of claim and a deadline of November 19, 2021 for governmental units to file proofs of claim.  (Doc. # 64).

Before further describing the events in the main bankruptcy case, I must digress briefly to mention the adversary proceeding ("AP") commenced by the Debtors on May 27, 2021, against Sharestates and certain other related parties.

In the 56-page, 383-paragraph Complaint, the Debtors asserted fourteen (14) claims against the Defendants.  The most prominent claims were for:

- avoidance of the Pier Village mortgages pursuant to 11 U.S.C. §544;

- avoidance of a Mortgage Modification Agreement between Pier Village and Sharestates and a Forbearance Agreement between Penn Treaty and Sharestates pursuant to 11 U.S.C. §§544, 547, and 548;

8

- damages on various lender liability theories;

- damages for fraud;

- damages for racketeering activity under the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§1961 et seq.; and

- equitable subordination under 11 U.S.C. §510.[7]

The AP remains in the pleading stage, with motions to dismiss the Debtors' Amended Complaint presently under advisement.[8]

Returning to events in the main bankruptcy case, by order dated August 20, 2021, I granted, on a preliminary basis, the Debtors' Motion to Extend the Automatic Stay pursuant to 11 U.S.C. §362(a)(3).  (Doc. # 88).[9]  At the hearing on that Motion, the Debtors expressed their intent to seek authority to obtain postpetition financing in connection with a prompt sale of all of the Debtors' Properties.  The August 20, 2021 Order set deadlines for the Debtors to file the requisite motions.

Between August 27, 2021 and September 2, 2021, the Debtors filed a flurry of motions.  For present purposes, the most significant motions sought:

- prohibition or limitation of Sharestates' and the Stewart Trust's right to credit bid at a bankruptcy sale of the Properties ("the Credit Bid Limitation Motion");

---

[7] In the interest of space and readability, I have attached as an Appendix an excerpt from a later motion filed by the Debtors in which they summarize the essence of the AP Complaint.  While it should go without saying, I will say it anyway:  I do not suggest that the allegations in the AP Complaint are true.  The allegations are hotly disputed by Sharestates and the other Defendants.  Further, Sharestates asserts, inter alia, that the claims asserted by Pier Village and Penn Treaty were released by those Debtors in the prepetition Mortgage Modification Agreement and Forbearance Agreement referenced above in the text.

[8] After the Defendants filed motions to dismiss the Complaint, the Debtors sought leave to amend their complaint on October 18, 2021.  I granted that request and allowed the Defendants to file additional memoranda in support of their dismissal request.  The last such memorandum was filed on December 21, 2021.

[9] The order extended the stay only to September 10, 2021.  However, since then, the parties have focused their attention on other contested matters and the creditors have not asserted that the automatic stay has expired.  Sharestates filed an affirmative motion for relief from the automatic stay on October 8, 2021, (Doc. # 182).  But since then, the parties asked the court to decide other pending motions (to be described above in the text) before conducting a hearing on Sharestates' stay relief motion.

- postpetition financing of $2,500,000.00 on a first priority lien basis for the NY Debtors collectively;

- postpetition financing on a first priority lien basis for the PA Debtors collectively;

- approval of sale procedures for a sale free and clear of liens, encumbrances and interests of the NY Properties;

- approval of sale procedures for a sale free and clear of liens, encumbrances and interests of the Pier Village and the Penn Treaty Properties;

- approval of sale procedures for a sale free and clear of liens, encumbrances and interests of the Frankford Property.

(See Doc. #'s 104, 105, 106, 111, 114, 116, 120).

The motions contemplated a stalking horse bid of $12,000,000.00 for the Pier Village and the Penn Treaty Properties, $400,000.00 for the Frankford Property and an unstated stalking horse amount for the NY Properties. Also, the motions indicated that requested postpetition financing would be provided by an entity related to the stalking horse bidder. In preliminary hearings before the court, the Debtors represented that the participation of the stalking horse purchaser/postpetition lender was premised on the grant of these motions, including the Credit Bid Limitation Motion.

The motions were opposed by Sharestates, Stewart Trust and the City.

On September 14, 2021, the Debtors filed a proposed chapter 11 plan ("Plan") and disclosure statement. (Doc. #'s 147, 148). The Plan is a liquidating plan, premised on sale of the various Properties. The Plan further provided that upon the sale of the Properties, the sale proceeds would be retained in escrow pending the determination of the Debtors' claims asserted in the AP.

After a series of agreed continuances, a hearing was held on November 4, 2021. The parties agreed that the first matter to be considered would be the Credit Bid Limitation Motion. The hearing was not concluded that day and resumed on December 9, 2021. At the conclusion of the December 9, 2021 hearing, I ruled from the bench, denying the Credit Bid Limitation Motion. (See

Doc. # 316).[10]

At the next scheduled hearing on December 20, 2021, the Debtors were not prepared to press for approval of their requests for postpetition financing and approval of sale procedures in light of the denial of the Credit Bid Limitation Motion.  Also, in light of the denial of the Credit Bid Limitation Motion, the Debtors acknowledged that the Plan filed on September 14, 2021 was not viable.  Consequently, they also could not prosecute their previously filed Motion to Approve Disclosure Statement (Doc. # 149).  That left the Motion to Dismiss/Convert and five (5) other matters scheduled on December 20, 2021.[11]

I chose to begin with Sharestates' Motion to Dismiss/Convert and the hearing on that motion was held and concluded that day.

At the hearing, Sharestates relied on documentary evidence in support of its Motion.  The Debtors presented two (2) witnesses — one of their principals, Alex Halimi, and their accountant, Stephen Scherf — as well as certain exhibits.  After the close of evidence, the parties offered

---

[10]     On December 8, 2021, I entered an order ruling on certain legal issues that arose at the November 4, 2021 hearing.  (See Doc. # 301).  In that order, I identified the legal standards the Debtors would have to satisfy to succeed on the Credit Bid Limitation Motion.  In denying the Motion, I found that the Debtors failed to meet their burden of proof.

[11]     The other matters were:

- NY Debtors' Motion to Pay Critical Vendors (Doc. # 120);

- Debtors' Application to Employ Keen-Summit Capital Partners LLC as Real Estate Advisor (Doc. # 163);

- Sharestates' Motion for Relief from the Automatic Stay (Doc. # 182);

- Debtors' Motion for to Extend Debtors' Time to File a Plan and to Extend the Automatic Stay (Doc. # 83);

- NY Debtors' Motion to Pay Critical Vendors, or in the Alternative to Assume Executory Contracts (Doc. # 120).

closing argument and agreed that no briefing was necessary, leaving the matter ready for decision.

# IV. THE PARTIES' POSITIONS

The Debtors oppose dismissal or conversion of the case.  Emphasizing that they have been very active, filing numerous motions in an effort to move the cases to confirmation, the Debtors seek additional time to propose a new sale process for the Properties and to file an amended chapter 11 plan.  As a fallback, if the Motion to Dismiss/Convert is granted, the Debtors request that the cases be dismissed rather than converted in order to preserve their rights against their creditors, Sharestates in particular.

Sharestates contends that it has established grounds for dismissal or conversion under 11 U.S.C. §1112(b).  Like the Debtors, Sharestates believes the best outcome for all will be obtained if the case remains in the bankruptcy court with a bankruptcy sale of the Properties.  However, Sharestates contends that the proper vehicle is chapter 7 — not chapter 11 — with a chapter 7 trustee controlling the sale process instead of the Debtors' management.  In advocating for this position, Sharestates expressed a general willingness to allow for a "carve-out" of the sale proceeds for the benefit of administrative expenses and unsecured creditors.[12]

Stewart Trust, the City, and the UST appeared at the hearing.  All of them support conversion of the cases to chapter 7.

Thus, the first choice of all parties is that the cases remain in the bankruptcy court to facilitate the sale of the Properties.  Obviously, an agreed sale process with the case remaining in chapter 11 would be the most prompt, economical, and efficient means to accomplish a sale of the Properties.  However, for reasons the parties were reluctant to share with the court, they cannot

---

[12]    For a general description of the "carve-out" concept, see In re White Glove, Inc., 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998).

agree among themselves on a sale process within chapter 11, leaving it to the court to determine the future of these bankruptcy cases.

## V.  THE MOTION TO DISMISS/CONVERT WILL BE GRANTED

### A.  Applicable Legal Principles: Grounds for Dismissal

Section 1112(b) of the Bankruptcy Code provides for the dismissal or conversion of a chapter 11 case to chapter 7 for "cause" on request of a party in interest.  Section 1112(b)(4)(A)-(P) provides sixteen (16) examples of "cause."  However, even if "cause" exists, §1112(b)(2) precludes dismissal or conversion if "unusual circumstances" exist such that that conversion or dismissal of the case is not in the best interests of the creditors or the bankruptcy estate and there is a reasonable likelihood that a chapter 11 plan will be confirmed within either a reasonable time or applicable statutory deadlines.[13]

The legal principles governing the application of §1112(b) are well settled and may be summarized as follows:

- Section 1112(b)(4) provides a non-exhaustive list of grounds for finding "cause" to convert or dismiss.

- Application of §1112(b) is a two-step process.  The initial burden is on the movant to prove by a preponderance of the evidence that there is "cause" for either conversion or dismissal of the chapter 11 case, whichever is in the best interests of creditors and the estate.

- Once cause is found, the burden shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors under §1112(b)(2).

- The court's determination regarding the existence of cause under Section 1112(b)(1) is a factual inquiry in which the court may exercise its discretion.

---

[13]    One qualification to the statement in the text is necessary.  Section 1111(b)(2) does not preclude dismissal or conversion if "cause" is established under §1112(b)(4)(A).  Also, if "cause" exists for any other reason, the party opposing dismissal or conversion must establish that there is reasonable justification for the act or omission that constitutes "cause" and the act or omission can be cured within a reasonable period of time.

- Once "cause" is established, the court's discretion is limited; it must grant some form of relief unless §1112(b)(2) applies.

See, e.g., In re Am. Cap. Equip., LLC, 688 F.3d 145, 161-63 (3d Cir. 2012); In re Korn, 523 B.R. 453, 464–65 (Bankr. E.D. Pa. 2014).


## B. Discussion

I find that "cause" exists under §1112(b)(1). Further, because the Debtors do not argue and have made no showing that "unusual circumstances" exist under §1112(b)(2), it is therefore necessary to dismiss or convert to chapter 7 the six (6) bankruptcy cases.

Here, "cause" exists because there is no reasonable prospect that the Debtors will confirm a chapter 11 plan within a reasonable time.[14]

At the time of the hearing, these cases had been pending for almost seven (7) months. The Debtors concede that the Plan they filed on September 14, 2021, four (4) months earlier, is not confirmable. They asked for more time to propose a new sale process and a new plan.

However, the Debtors knew for months that their plan confirmation strategy was running into fierce opposition from their major creditors. And, at least ten (10) days before the hearing on the Motion to Dismiss/Convert, the Debtors were aware that the Credit Bid Limitation Motion — the foundation of their plan — had been denied. In spite of their precarious position, they appeared at the hearing with nothing more than a request for more time. At this stage of the case, that request is too little, too late.

---

[14]    I am aware that §1112(b)(4)(A), which refers to "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" is written in the conjunctive. However, as previously stated, the examples of "cause" in §1112(b)(4) are illustrative and non-exhaustive. It is well settled that a debtor's inability to achieve confirmation of a plan, by itself, provides sufficient "cause" for dismissal or conversion of a chapter 11 case. See, e.g., In re DCNC N.C. I, LLC, 407 B.R. 651, 665 (Bankr. E.D. Pa. 2009), aff'd sub nom. DCNC N.C. I v. Wachovia Bank, N.A., 2009 WL 3856498 (E.D. Pa. Nov. 13, 2009); accord Lippman v. Big Six Towers, Inc., 2021 WL 1784312, at *3 (E.D.N.Y. May 5, 2021); Samuels v. Wilmington Sav. Fund Soc'y, FSB, 2019 WL 6211209, at *4-6 (B.A.P. 1st Cir. Nov. 19, 2019).

As a general principle, a chapter 11 case must progress at a reasonable pace to confirmation of a plan. Put colloquially, chapter 11 cases have a limited "shelf life." This is especially true in SARE cases. See In re Creekside Sr. Apartments, L.P., 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013); see also In re M & C P'ship, LLC, 2021 WL 1679058, at *12 (Bankr. E.D. La. Apr. 28, 2021) ("Congress intended single asset real estate cases to move expeditiously").

In exercising my discretion to conclude that these cases have not progressed sufficiently to warrant their continuation in chapter 11, I am influenced by the policy embedded in 11 U.S.C. §362(d)(3), which governs the maintenance of the automatic stay in SARE cases.

Section 362(d)(3) provides "generally, for relief from the automatic stay unless the Debtor has, within 90 days after commencement of the case, either filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time, or has commenced making regular monthly interest payments." In re Phila. Rittenhouse Dev., L.P., 2011 WL 13043475, at *5 (Bankr. E.D. Pa. May 25, 2011).[15]

---

[15]    The statute provides that a court shall grant relief from the automatic stay:

> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—
>
>> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>>
>> (B) the debtor has commenced monthly payments that—
>>
>>> (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
>>>
>>> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

The purpose of this provision "is to protect a secured creditor whose collateral is real estate from perceived abusive filing by real estate developers whose prospects for reorganization are dim." Joan N. Feeney, et al., 1 Bankruptcy Law Manual §7:55 (5th ed. West 2021); accord In re Triumph Inv. Grp., Inc., 2009 WL 2916986, at *2 (Bankr. E.D. Pa. Apr. 23, 2009) (citing Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy, ¶ 362.07[5], [b] (15th rev. ed. 2007) ("Collier")).

Given Congress' policy requiring prompt progress toward reorganization in SARE cases, as expressed in 11 U.S.C. §362(d)(3), these requirements, including the existence of an explicit time deadline in §362(d)(3), inform a court's decision regarding dismissal under 11 U.S.C. §1112(b). See In re Riverbend Cmty., LLC, 2012 WL 1030340, at *3 (Bankr. D. Del. Mar. 23, 2012).

There is no dispute here that the Debtors have not commenced making monthly interest payments to Sharestates.  Nor have they filed a plan capable of confirmation.

Section 362(d)(3) requires a SARE debtor to satisfy these requirements within ninety (90) days after commencement of the case (or thirty (30) days after the court determines that the Debtor is a SARE debtor).  Here, the Debtors acknowledged in their petitions that they SARE debtors, making the 90-day deadline applicable.  When the hearing on the Motion to Dismiss/Convert was held, the cases were more than 210 days old.

In these circumstances, I conclude that the Debtors have not filed a plan with a reasonable possibility of being confirmed within a reasonable period of time.  The Debtors have made insufficient progress toward a confirmed plan to warrant further restraint of the creditor body (and, in particular, the secured creditors' right to realize their collateral).  Therefore, I find that "cause" exists under §1112(b) for dismissal or conversion of these bankruptcy cases.

In reaching this conclusion, I acknowledge that the Debtors have not simply languished lazily in chapter 11.  Their efforts to sell their assets and confirm a plan were robust.  However, they

---

11 U.S.C. §362(d)(3).

16

made a choice to use their limited "shelf life" to pursue a very aggressive reorganization strategy —

attacking the amount and lien position of their major secured creditors as well as those creditors'

right to credit bid.

I am not in a position to say whether that was the only or best reorganization approach

available to the Debtors.  But, that choice had consequences.  After the Credit Bid Limitation

Motion was denied, rendering their filed plan unconfirmable, and with the Motion to

Dismiss/Convert pending, the Debtors apparently had no backup sales process (or at least no sales

process capable of achieving creditor consensus).  Nor did they have an amended chapter 11 plan to

propose.  With the cases in this posture, dismissal or conversion is appropriate.


# VI. THE NY DEBTORS' CASES AND THE FRANKFORD CASE WILL BE DISMISSED; THE PIER VILLAGE AND PENN TREATY CASES WILL BE CONVERTED TO CHAPTER 7

### A. Applicable Legal Principles

After granting a motion under 11 U.S.C. §1112(b), the court must decide whether to dismiss

or convert the case based on "the best interests of creditors and the estate."  This determination is

committed to the discretion of the bankruptcy court.  Am. Cap. Equip.,688 F.3d at 163; In re

Camden Ordnance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 798 (E.D. Pa. 2000); In re Calrissian

LP, 2018 WL 3854004, at *2 (Bankr. D. Del. Aug. 10, 2018).

In exercising this discretion, courts frequently consider a list of factors.  I set out one (1)

such list in In re Ramreddy, 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009):

> 1. whether some creditors received preferential payments, and whether equality of
>    distribution would be better served by conversion rather than dismissal;
>
> 2. whether there would be a loss of rights granted in the case if it were dismissed
>    rather than converted;

3. whether the debtor would simply file a further case upon dismissal;

4. the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

5. in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

6. whether any remaining issues would be better resolved outside the bankruptcy forum;

7. whether the estate consists of a "single asset";

8. whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

9. whether a plan has been confirmed and whether any property remains in the estate to be administered;

10. whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

11. consideration of the effect of dismissal under 11 U.S.C. § 349.

Courts have identified other relevant considerations, such as:

1. the prospect of payment of any secured, priority, general unsecured claims, and administrative claims after dismissal;

2. whether conversion to chapter 7 would result in benefits only to secured creditors;

3. any other prejudice to parties in interest from conversion or dismissal;[16] and

4. the preferences expressed by the debtor's creditors.[17]

As I have previously observed,

---

[16]    In re Sandia Resorts, Inc., 562 B.R. 490, 496 (Bankr. D.N.M. 2016).

[17]    In re Orienta Co-op. Ass'n, 256 B.R. 508, 512 (Bankr. W.D. Okla 2000) ("The fact that the creditors are seeking conversion rather than dismissal is indication that it is in the best interest of the creditors to convert the case to Chapter 7 rather than to dismiss it.").

> . . . the application of any multi-factor judicial test . . . is not a mechanical or mathematical exercise.  Not all of the factors may be relevant in a particular case; the factors that are relevant may not be entitled to equal weight.  Rather, the list of considerations employed by a court in making a decision is simply . . . a guide to the required inquiry; the wise exercise of discretion is rarely a matter of score-keeping or bean-counting.

In re Kennedy, 2013 WL 5230026, at *1 (Bankr. E.D. Pa. Sept. 9, 2013) (quotations and citation

omitted).[18]

Some courts have suggested a much simpler, unitary standard for deciding whether to

dismiss or convert a chapter 11 case: the course of action that results in the largest number of

creditors being paid the largest amount of money in the shortest amount of time.  In re McQuillen

Place Co., 609 B.R. 823, 833 (Bankr. N.D. Iowa 2019) (citing In re Aurora Memory Care, LLC, 589

B.R. 631, 643 (Bankr. N.D. Ill. 2018)); accord In re H2D Motorcycle Ventures, LLC, 617 B.R. 625,

635 (Bankr. E.D. Wis. 2020).

With these principles in mind, I turn to the choice between dismissal and conversion.

### B.  The NY Debtors and Frankford

The cases of the NY Debtors and Frankford are substantially similar.  They are all SARE

cases in which the real property is overencumbered and the few non-insider creditors that exist hold

modest claims.

This asset/debt structure militates in favor of dismissal.   There are few unsecured creditors,

and conversion to chapter 7 will not maximize the estate's value because there are no unencumbered

assets.

In cases of this nature, the secured creditor typically requests dismissal rather than

---

[18]    Consequently, it is not my practice — as in some reported decisions — to go through each and every factor in the multi-factor test and categorize them as supporting conversion or dismissal, or as "neutral" or "not applicable."  I simply will refer to the factors I have considered in exercising my discretion.

conversion.  See, e.g., In re Visicon S'holders Tr., 478 B.R. 292, 316 (Bankr. S.D. Ohio 2012).  Yet, here, Sharestates requests conversion to chapter 7.

Given the posture of these cases, Sharestates' preference is understandable.  All of the parties agree that a prompt bankruptcy sale will maximize the sales price of the Properties.  The parties also assume that a chapter 7 trustee sale is likely to occur more quickly than a state court foreclosure sale.

To justify conversion to chapter 7 over dismissal in order to expedite a sale of the Properties, Sharestates has expressed willingness to provide a "carve-out" from its entitlement to the sales proceeds for the benefit of chapter 7 administrative expenses and unsecured creditors.  Sharestates further contends that there are irregularities in the Debtors' conduct and that warrant an investigation by a chapter 7 trustee.[19]  Overall, Sharestates' position finds support from the other creditors who have appeared and the UST.[20]  And, as stated earlier, courts have recognized the preferences of the creditor body as a factor to be considered by the court in choosing between dismissal and conversion.  See n.17, supra.

Sharestates makes a reasonable case for conversion.  Nevertheless, I am not persuaded that conversion is more appropriate than dismissal of the NY Debtors and Frankford cases.

When the reported cases speak of the best interests of the "creditors," they generally refer to unsecured creditors.  I acknowledge that the statutory term is unqualified and conceivably could refer to secured creditors as well.  But in my research, I have not located a case in which a court converted a chapter 11 case to chapter 7 where there was no equity in the estate assets (or the

---

[19]    Sharestates suggests that the Debtors have not accounted for all of the loan proceeds that it disbursed.  Also, Sharestates refers to the substantial amount of accounts receivable scheduled by the Debtors.

[20]    This requires qualification.  Sharestates is the sole secured creditor in the NY Debtors cases.  The City is a secured creditor in the Frankford case and supports conversion.  The UST supports conversion of all of the Debtors' cases.

existence of estate causes of action) and where it was probable that that there would be no distribution to unsecured creditors, leaving the secured creditor as the sole beneficiary of the bankruptcy process.  This is consistent with bankruptcy policy — broadly speaking, the bankruptcy court does not serve as an expedited foreclosure court for the sole benefit of secured creditors. Chapter 7 trustee sales under 11 U.S.C. §363 generally must provide some benefit to unsecured creditors.  See, e.g., In re KVN Corp., Inc., 514 B.R. 1, 5-6 (9th Cir. B.A.P. 2014); In re Rambo, 297 B.R. 418, 433-34 (Bankr. E.D. Pa. 2003).

Here, even if I were to approve a carve-out, the benefit to non-insider unsecured creditors — other than Sharestates — would likely be negligible.  The present non-insider unsecured creditor body holds only minimal claims against the NY Debtors and Frankford.[21]  By contrast, Sharestates likely will hold significant unsecured claims against these Debtors due to its undersecured position. As a result, the distribution to the non-insider unsecured creditors would be diluted severely by a Sharestates unsecured claims receiving a pro rata distribution.  Further, if the insider claims are allowed, the distribution to the non-insiders would be diluted even further.  In fact, in that scenario, it is difficult to foresee the existence of a bankruptcy estate likely to provide a meaningful distribution to any of these creditors.

In short, I perceive that an insufficient chapter 7 "bankruptcy purpose" would be served by converting the cases of the NY Debtors and Frankford to chapter 7.

### C.  Pier Village and Penn Treaty

The Pier Village and Penn Treaty cases stand on different footing.

---

[21]      This is particularly true with respect to Frankford which has only two (2) allowed, non-insider, unsecured claims, totaling $14,000.00.  Kingsland has $42,000.00 in such claims, Hancock has $50,000.00 and 231 E. 123 has $41,000.00.

Like the NY Debtors and Frankford, both of the properties owned by the Pier Village and Penn Treaty Debtors are severely overencumbered by the first mortgage positions of Sharestates (and in Pier Village, Stewart Trust).[22]  However, in contrast to the NY Debtors and Frankford, the present unsecured creditor claims (apart from any unsecured claims arising from Sharestates' and Stewart Trust's undersecured mortgages) of Pier Village and Penn Treaty are substantial.

The most prominent unsecured creditors in Pier Village and Penn Treaty provided construction-related services to the Debtors.  These creditors have asserted mechanic's lien claims in excess of $1,300,000.00 in Pier Village and $850,000.00 in Penn Treaty.  While the mechanic's lien creditors have filed secured claims, in practical terms, these claims are likely to be allowed unsecured claims because they likely are junior to the Sharestates' and Stewart Trust mortgages, whose balances far exceed the value of the Pier Village and Penn Treaty properties.  See 11 U.S.C. §506(a)(1).  In addition to these functionally unsecured mechanic's lien claims, Pier Village and Penn Treaty have over $200,000.00 and $67,000.00 of non-insider unsecured claims, respectively.

Given the amount of unsecured claims in Pier Village and Penn Treaty, it is easy to perceive a chapter 7 bankruptcy purpose to the conversion of these cases.

Predicting whether collection of the Debtors' scheduled accounts receivable, prosecution of the AP, or a negotiated carve-out with Sharestates (and Stewart Trust) from a Section 363 sale of the Properties will result in a meaningful distribution to unsecured creditors is impossible.  Nevertheless, a chapter 7 trustee's evaluation of these sources to augment or create an estate provides the best chance for the largest number of creditors to be paid the largest amount of money in the shortest amount of time.  It is therefore in the best interest of creditors to convert

---

[22]    Stewart Trust only holds a mortgage on certain lots of the Pier Village property.

these cases.[23]

For all of these reasons, I conclude that conversion of Pier Village and Penn Treaty cases

to chapter 7 is appropriate.

### D.  The AP

Finally, in exercising my discretion with respect to all six (6) Debtors, I have considered the

effect the differing dispositions of these cases may have on the rights of the parties in the AP and, in

particular, the effect on the Debtors.

Once the Pier Village and Penn Treaty cases are converted to chapter 7, control of the

prosecution of the AP will pass from those Debtors to the chapter 7 trustee.  But the other Debtors,

also plaintiffs in the AP, will remain in control of their claims upon dismissal of their cases.  See 11

U.S.C. §554(c).

The existence of an AP in which some of the debtor-plaintiffs are controlled by a chapter 7

trustee, while other plaintiffs are not, may be a bit awkward.  In the end, however, this situation does

not present a problem that requires a different disposition of the Motion to Dismiss/Convert.

Initially, the dismissal of the NY Debtors and Frankford raises a jurisdictional issue in the

AP.[24]  Once dismissed as bankruptcy debtors, the claims of the NY Debtors and Frankford against

---

[23]    My decision regarding dismissal or conversion of the Pier Village and Penn Treaty cases is
influenced by an additional factor, albeit to a relatively minor degree only.

The Pier Village and Penn Treaty Properties both are located in section of the city of Philadelphia
that is perceived to play a significant role in the economic development of the city.  To some degree, there
is a public interest in the prompt reintroduction of the Properties into the commercial sector.  A bankruptcy
sale of the Pier Village and Penn Treaty Properties, rather than a disposition through the state law
foreclosure process, will serve the public interest in a manner that distinguishes these two (2) cases from
the other four (4) SARE cases before the court.

[24]    The court has an independent duty to determined that it has subject matter jurisdiction.  See, e.g.,
Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 76-77 (3d Cir. 2003), cert. denied, 541 U.S. 959 (2004); see
also Thomas v. City of Phila., 759 Fed. App'x 110, 111 (3d Cir. Jan. 3, 2019) (nonprecedential) (describing
this principle as "axiomatic").

Sharestates become those of non-debtors against other non-debtors. For their claims to remain in this court as a proceeding "related to" the pending bankruptcy cases, see 28 U.S.C. §1334(b), the NY Debtors and Frankford will need to show that the determination of their claims may have some impact on the administration Pier Village or Penn Treaty bankruptcy estates. See Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984). The overlapping of issues and judicial economy, by themselves do not support the exercise of bankruptcy jurisdiction in the absence of some impact on the bankruptcy estate. In re Bobroff, 766 F.2d 797, 802 (3d Cir. 1985); In re Island View Crossing II, L.P., 598 B.R. 552, 560 (Bankr. E.D. Pa. 2019); In re Spree.Com Corp., 295 B.R. 762, 776 (Bankr. E.D. Pa. 2003). This issue will have to be determined subsequently in the AP.

If the NY Debtors and Frankford are dismissed as parties in the AP for lack of subject matter jurisdiction, they may pursue their claims in a non-bankruptcy forum. It is not ideal for these claims to be litigated in two (2) courts. But, parallel litigation in the bankruptcy court and other courts is a fact of life given the limited jurisdiction of the bankruptcy court. And, the negative aspects of parallel litigation may be ameliorated by the fact that virtually of the conduct alleged to give to Sharestates' liability asserted in the AP Complaint involves Sharestates' treatment of Pier Village and Penn Treaty, not the other Debtors. I bring this up not to opine on the disputed issue of whether the other Debtors even have any claims against Sharestates, but only to point out that if the other Debtors initiate an action against the AP Defendants in another forum, it should not be difficult to coordinate discovery between the two (2) proceedings to minimize duplication and unnecessary expense.

On the bright side (from the other Debtors' perspective), even if they are dismissed as parties from the AP, they still have the benefit of dismissal -- leaving them in control of their lender liability claims and state court defenses to foreclosure, as they requested. The only downside is that they must initiate their claims anew in other courts.

As for the effect of conversion to chapter 7 of the Pier Village and Penn Treaty cases on the rights of those Debtors, as stated earlier, control of the AP does pass to the Trustee.  The Trustee will be in the position to evaluate the strength of the AP claims.  Conceivably, the Trustee will reach a settlement, in which case the Debtors can assess the reasonableness of the settlement and if they believe they have grounds to do so, they may assert that the Trustee has not properly exercised his or her business judgment.  See Fed. R. Bankr. P. 9019; In re Martin, 91 F.3d 389, 395 (3d Cir. 1996).  Or, the Trustee may choose not to pursue the AP, in which case he will abandon the claims.  See 11 U.S.C. §554.  If abandoned, the claims would revert to the Pier Village and Penn Treaty Debtors, who are then free to pursue them.  See, e.g., In re Wilton Armetale, Inc., 618 B.R. 424, 436 (Bankr. E.D. Pa. 2020) (citing 5 Collier ¶ 554.02 (16th ed. 2020)).  Of course, the third possibility is that the Trustee prosecutes the AP to judgment, win or lose.

None of these scenarios prejudice the Pier Village or Penn Treaty Debtors.

## VII. CONCLUSION

For the reasons stated above, I will grant the Motion to Dismiss/Convert, dismiss the cases of the NY Debtors and Frankford and convert the Pier Village and Penn Treaty cases to chapter 7. An appropriate order follows.

Date:  January 11, 2022

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

# APPENDIX

***Excerpt from Debtor's Motion To Limit Credit Bid Pursuant to 11 U.S.C. §363(k) (Doc. # 104):***

13. As described more extensively in the Complaint, Sharestates offered construction loans to the Debtors, to be disbursed in incremental draws.

14. The failure to disburse upon any valid draw request would cause a snowball effect, as unpaid contractors refused to continue work, and the subsequent stages of construction could not be completed on schedule.

15. Sharestates, a crowd-funded real estate investment platform, did not have the ability to fund all promised disbursements from its "warehouse line" of credit and had to obtain new individual crowd-funding investors for each disbursement.

16. When Sharestates was unable to do so, it manufactured issues with the Projects to delay disbursements to the Debtors.

17. Sharestates also used these delays, which constituted a breach of the lending contracts, to extract further concessions from the Debtors, including changes in the draw process, use of specific appraisers, and other improper interference with the daily business operations of the Debtors.

18. Sharestates was thus able to manufacture defaults and then cross-default all the Debtors at will.

19. Sharestates' forced changes to the draw process, and Sharestates' breach of the revised draw process, forced the Debtors to halt work on the Projects.

20. By calling manufactured defaults, Sharestates was able to increase the debt purportedly owed by invoking default provisions of the loans and imposing higher interest rates and assessing attorney fees and costs.

21. Sharestates also depleted the available funds before disbursement by charging interest on the entire loan amount – in direct violation of the contractual provision assessing interest only on the disbursed amounts.

22. These inequitable and improper actions by Sharestates ran up the amount of the debt for
Sharestates' sole benefit, caused the failure of all Debtor Projects, and forced the Debtors to file
the instant bankruptcies.